Paul **HEBERT**

v.

**CALIFORNIA OIL COMPANY,**
**Defendant and Third-Party**
**Plaintiff,**

v.

**NOBLE DRILLING CORPORATION,**
**Aetna Casualty & Surety Company, Universal Services, Inc., and the Travelers Insurance Company, Third-Party Defendants.**

**Civ. A. No. 9919.**

United States District Court
W. D. Louisiana,
Lafayette Division.

Sept. 27, 1967.

Joseph A. Koury, Lafayette, La., for plaintiff.

Lloyd Cyril Melancon, McLoughlin, Barranger, West & Provosty, New Orleans, La., for California Oil Co.

Adams & Reese, George Baus, New Orleans, La., for Aetna Casualty & Surety Co. and Noble Drilling Corp.

Davidson, Meaux, Onebane & Donohoe, John Allen Bernard, Lafayette, La., for Travelers Insurance Co. and Universal Services, Inc.

## MEMORANDUM OPINION

PUTNAM, District Judge.

This case arises out of a suit filed against California Oil Company by Paul Hebert, seeking recovery for personal injuries allegedly suffered by him when he slipped and fell because of a foreign substance on the deck of the S–55, a submersible drilling barge owned by California and in service off the coast of Louisiana on the outer continental shelf. Plaintiff alleged that he was an employee of Universal Services, Inc., but that at the time of the accident he was performing services in the status of an employee of California. His first cause of action was laid under the Jones Act, 46 U.S.C.A. § 688, the second was for maintenance and cure, and the third for negligent failure to furnish a reasonably safe place in which to work and for unseaworthiness of the vessel upon which he was employed, under general maritime principles.

California filed third party complaints against Noble Drilling Company and its insurer, Aetna Casualty and Surety Company, and against Universal Services, Inc. and its insurer, Travelers Insurance Company, based upon the insuring and indemnity provisions of contracts entered into for the conduct of the operation in question. Noble and Aetna filed a cross-complaint against Universal and Travelers under the insuring and indemnity provisions of Noble's contract with Universal. To complete the circle, Travelers has filed a third party complaint against Firemen's Fund Insurance Company, California's insurance carrier, and a cross-claim against Aetna, for pro rata distribution of the loss under the co-insurance clause of its policy.

California settled Hebert's claim upon payment of $8,000.00 to him for his injuries, a sum agreed to be reasonable by all parties and commensurate with damages resulting from the hernia he sustained as a result of the fall.

All claims were submitted to the Court for determination on the basis of the evidence in the record on November 9, 1965, and on written briefs. Supplemental briefs have been filed with the Court from time to time, the last having been received May 11, 1967.

We resolve the facts as follows:

1. California is engaged in the business of discovering and producing oil, gas and other minerals in the coastal waters of Louisiana and elsewhere, in the course of which it owns and operates the S–55. On February 8, 1963, by letter agreement with Noble, the latter agreed to drill and complete a well in the South Timbalier Area of the Gulf of Mexico. The parties adopted the terms of a previous contract dated January 28, 1962 to govern their relationship in this undertaking.

2. Under this agreement Noble, a drilling contractor, was to furnish certain items of material and equipment, listed on Exhibit "A", and was to arrange for and secure other items, listed on Exhibit "B", necessary for the operation of the barge for the account of California. these last items included:

"Food, food supplies and other materials and supplies reasonably necessary

for the adequate quartering of employees of Contractor, Operator and third parties.

"Labor: Actual cost of labor to operate and maintain galley, dining room, living quarters, and Operator's S–55 drilling barge."

Under Sections 2, 3 and 7(5) of the contract, Noble was to pay for these supplies and labor, and, through periodic accounting, was to be reimbursed the actual cost thereof. California agreed for its part to furnish the submersible drilling barge in question. The contract has none of the indicia of a bareboat charter of the vessel, nor can it be said that there was a joint undertaking to drill the well. This was a California enterprise, pure and simple. Section 5 of the agreement, however, provided that responsibility "to arrange for the day-to-day" operation of the galley and quartering facilities of the S–55 was assumed by Noble. Noble is a drilling contractor, not engaged in the catering business. In arranging for and securing galley hands and provisions to man and supply California's operating barge, *for California's account,* it was no more than California's hiring agent. When these arrangements were made and labor secured, Noble's contractual obligations were satisfied, and responsibility for the actual operation of the galley passed from it. The actions of the parties in the execution of the contract further sustain this interpretation, as will be seen hereinafter.

3. Noble arranged for day-to-day operation and maintenance of the galley and living quarters by obtaining these services under a contract between it and Universal, dated June 19, 1959. Exhibit "D", attached to that agreement on July 1, 1959, shows that the arrangement for Universal to service the S–55 was of long standing and antedated the California-Noble contract of 1962. While there is no direct testimony or evidence in the record that Universal expressly accepted the terms of the agreement between California-Noble of January 28, 1962 (readopted February 8, 1963), other than the fact that California was added as an additional insured under its insurance policy No. 9322469 with Travelers on July 2, 1962, and coverage extended to the outer continental shelf of the United States on the same date, the only reasonable inference that can be drawn is that Universal tacitly did so, *with California's approval,* and assumed responsibility to furnish men and supplies to California for the operation of the S–55 galley and living quarters, pursuant to the terms of the California-Noble contract.

4. Hebert's immediate employer was Universal. He reported for duty aboard the S–55 at Universal's direction and received his pay from this corporation, a catering concern. The services he rendered were rendered for California, however, as part of the operational activities necessary for the functioning of the drilling barge and the accomplishment of its mission, an enterprise we find to be within the scope of the owner's business interests. He consented to this arrangement completely, as did California. Although the corporate entities involved termed their relationship to be that of principal and independent contractor, right of control over the operation of the drilling barge as a whole rested upon California. The entire undertaking had to be directed, correlated and run as a unitary enterprise for its ultimate success and for the safety of all persons aboard.

5. In the execution of the contract, California had a barge foreman or captain aboard the S–55, a Mr. Anderson. This man was in charge of the barge, responsible for all maintenance required, loading and unloading of supplies, and direction of the work of the various departments on the barge, including galley and living quarters. He made daily inspections of the entire vessel. Deckhands or "roustabouts" for work outside of the galley and living quarters were furnished by Service Contractors, Inc. and they, like the galley crew, were assigned their daily tasks by Anderson, through their gang foreman or "pusher".

A petroleum engineer in the employ of California was in charge of the actual drilling operations, with extensive authority retained by California in respect to various phases of drilling and completion of the well under Section 6 of the agreement. We do not discuss these provisions in detail, as we are concerned in this case primarily with the functions of galley and deck operation and maintenance, and the control and direction thereof.

6. Work was divided, by Anderson, in respect to the loading and unloading of supplies for the galley. California furnished supply vessels for transportation of such supplies to and from the shore. When a supply boat came alongside, some of the roustabouts were assigned to assist in unloading them onto the loading area of the outside deck of the S–55. When unloaded, the galley crew was assigned to pick them up, carry them into the galley area and store them for future use. The chief steward of Universal's crew was the man in charge of the galley and living quarters, with whom Anderson dealt.

7. On the day in question, according to the uncontradicted testimony of Hebert, supplies had come alongside and he was called by Anderson to attend to storage. He stepped through a door leading from the galley area to the unloading area of the deck, some distance away. At that time, he found the deck outside the door to be dry. On his return carrying a box of supplies, he slipped and fell. It was his further testimony that during the interval of time when he left the galley and returned, someone, presumably the roustabouts, had commenced washing down some other area of the barge, probably the pipe rack, and the slippery residue was permitted to flow down and remain upon the deck. This residue consisted of drilling mud and water. It collected between the deck plates at the door. These were double plates, according to the testimony of Mr. Stickney, and are shown in photographs attached to his deposition. Hebert did not see the slippery condition of the deck until after he fell. He recalls that he was wet and dirty and changed clothes after this incident. We accept his uncontradicted version of the accident. A hernia resulted.

8. We find that the sole proximate cause of Hebert's injury was the presence of a slippery substance on the deck of the S–55 just outside of the galley door. Since his uncontradicted testimony was to the effect that when he was called by Anderson to attend to storing provisions for the galley this area of the deck was dry and no washing operation was in progress, we find no merit in the contention made by California that he was contributorily negligent in failing to see it upon his return a few minutes later carrying supplies. This substance was there because the roustabouts were permitted or directed by Anderson to wash down some portion of the ship in the exercise of his authority and responsibility as California's barge foreman to see to it that the barge was maintained. To permit the washing operation to proceed under the facts and circumstances we find here, or to fail to warn of the dangerous condition which was its by-product, was negligence directly attributable to California. Moreover, by reason of this accumulation on the deck, the taint of unseaworthiness in breach of the owner's nondelegable warranty to provide a seaworthy vessel, attached immediately "when and where" it occurred. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941; Waldron v. Moore-McCormack Lines, Inc., May 8, 1967, 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482.[1]

---

1. These two decisions put at rest the recent conflict between the Circuits on the distinction between "operational negligence" and "instantaneous unseaworthiness". See: Dugas v. Nippon Yusen Kaisha, 5 Cir. May 9, 1967, 378 F.2d 271; Antoine v. Lake Charles Stevedores, Inc., et al., 5 Cir. April 13, 1967, 376 F.2d 443; Robichaux v. Kerr McGee Oil Industries, Inc., 5 Cir. April 13, 1967, 376 F.2d 447, and authorities therein cited and discussed.

**760**

■ 9. The S–55 was a vessel in navigation engaged in carrying out the special purpose for which she was designed and outfitted. Hebert was a member of the crew. This question is no longer open to dispute, the jurisprudence in this area being exhaustively reviewed in Offshore Co. v. Robison, 5 Cir. 1959, 266 F.2d 769, 75 A.L.R.2d 1296; Producers Drilling Co. v. Gray, 5 Cir. 1966, 361 F.2d 432; and Marine Drilling Co., Inc., et al. v. Autin, 5 Cir. 1966, 363 F.2d 579.

■ 10. Hebert's claim against California under the Jones Act would depend upon whether or not he was "employed" by or an "employee" of that company (as a seaman or member of the crew of a vessel) within the meaning of the Federal Employers' Liability Act, 45 U.S.C.A. § 51, as a matter of Federal law. Cosmopolitan Shipping Company v. McAllister, 1949, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (see particularly 337 U.S. at 795). This relationship is generally to be determined by common law standards considering the words in their ordinary and usual sense. All facts and circumstances in each particular case must be taken into consideration. Shenker v. Baltimore & Ohio R. Co., 1963, 374 U.S. 1, 83 S.Ct. 1667, 10 L.Ed.2d 709; Ward v. Atlantic Coast Line R. Co., 1960, 362 U.S. 396, 80 S.Ct. 789, 4 L.Ed.2d 820; Baker v. Texas & Pacific Railway Company, 1959, 359 U.S. 227, 79 S.Ct. 664, 3 L.Ed.2d 756; Southern Shell Fish Company v. Plaisance, 5 Cir. 1952, 196 F.2d 312; Penn-

sylvania R. Co. v. Barlion, 6 Cir. 1949, 172 F.2d 710; Cimorelli v. New York Central Railroad Co., 6 Cir. 1945, 148 F.2d 575; Restatement 2d, Agency, §§ 220 and 227. Varying results have been reached, compare: Schiemann v. Grace Line, Inc., 2 Cir. 1959, 269 F.2d 596; Byrne v. Pennsylvania R.R. Co., 3 Cir. 1959, 262 F.2d 906; Williams v. Milwhite Sales Company, E.D.La. 1961, 197 F. Supp. 730; Sims v. Marine Catering Service, Inc., E.D.La. 1963, 217 F.Supp. 511; Norris, The Law of Seamen 1962, §§ 662, 667, cases cited footnote 4, p. 807.[2]

In recent decisions the courts have referred consistently to the above-cited sections and comments of Restatement 2d, as setting forth the factors to be considered in determining the relationship of master and servant, either directly or under the borrowed servant doctrine. Baker v. Texas & Pacific Railway Company, supra; Ward v. Atlantic Coast Line R. Co., supra. In *Ward* it is emphasized that the conception of their relationship by the parties themselves is not of itself decisive.

■ It is this court's opinion that the circumstances found here would sustain a holding that the relation of master and servant existed between Hebert and California, as in Cimorelli v. New York Central Railroad Co., supra. Restatement 2d, Agency, § 220, comment (d). The circumstances of Hebert's immediate employment by Universal, however, makes a finding that he was lent or rented to California by his employer

2. We pretermit entirely the questions of (1) whether or not a shipowner may, as a matter of law, place a vessel into operation and, through a series of subcontracts letting out its essential operational and departmental activities to so-called independent contractors, insulate itself from liability under the Jones Act to members of her crew. See: Sinkler v. Missouri Pacific R. Co., 1958, 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799; Hopson v. Texaco, Inc., 1966, 383 U.S. 262, 86 S.Ct. 765, 15 L.Ed.2d 740 (extending the Sinkler Doctrine to Admiralty); and Shenker v. Baltimore & Ohio R. Co., 1963, supra, further enlarging upon the

Sinkler case; and (2) whether or not in the instant case the entire contractual arrangement was confected with the end in view of circumventing the Jones Act in particular, thus being violative of the express provisions of 45 U.S.C.A. § 55. Compare: Erie R. Co. v. Margue, 6 Cir. 1928, 23 F.2d 664; Eddings v. Collins Pine Co., D.C.Colo.1956, 140 F.Supp. 622; Ward v. Atlantic Coast Line R. Co., 5 Cir. 1959, 265 F.2d 75, pp. 86, 87, reversed on other grounds 362 U.S. 396, 80 S.Ct. 789; and Hopson v. Texaco, Inc., 4 Cir. 1965, 351 F.2d 415, reversed on other grounds, 383 U.S. 262, 86 S.Ct. 765.

more in keeping with the total facts of this case and the intent of the parties as expressed by the contracts and their actions in execution thereof. We so hold. See: Standard Oil Co. v. Anderson, 1907, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; Linstead v. Chesapeake & Ohio Ry. Co., 1928, 276 U.S. 28, 48 S.Ct. 241, 72 L.Ed. 453; Baker v. Texas & Pacific Railway Company, supra. Compare, Shenker v. Baltimore & Ohio R. Co., supra. Restatement 2d, Agency, § 227, comments (a) and (c) seem particularly appropriate here. This status exists with respect to all claims made by Hebert in his suit against California.[3]

■ 11. But the Court is not required to determine the exact employment status of Hebert to fix the liability of California for damages resulting from the accident in question. We have found this defendant guilty of negligence and of a breach of its warranty to furnish a seaworthy vessel, resulting simultaneously from the same course of conduct, either or both of which proximately caused the accident. Assuming the position most favorable to California, that he was aboard the S–55 as an employee of Universal, an independent contractor, and not as a member of the ship's company employed by the owner, the failure to exercise reasonable care to furnish him a safe place in which to work while aboard was a breach of duty owed to him by the owner, under well-established principles of maritime tort, even if his status was that of a guest, for negligence in tort, as recognized in Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, at p. 632, 79 S.Ct. 406, 3 L.Ed.2d 550, and cases cited therein.

■ 12. As he was engaged in work traditionally performed by crew members, the action for damages resulting from the unseaworthy condition of the deck was also available to him under the doctrine of Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, and Pope & Talbot,

Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, as recently applied in Smith v. Brown & Root Marine Operators, Inc. W.D.La. 1965, 243 F.Supp. 130, aff'd per curiam, sub nom Underwater Services, Inc. v. Brown & Root Marine Operators, Inc., 5 Cir. 1967, 376 F.2d 852. Thus, quoad plaintiff Hebert, California finds itself in the proverbial box. Also in the package are its third party claims.

## I. CALIFORNIA vs. NOBLE and UNIVERSAL

■ 13. This brings us to the real matter in dispute. Can Noble or Universal be required to indemnify California under the terms of the contracts set out hereinafter or under an implied obligation to indemnify for breach of the duty of workmanlike performance of their respective contractual undertakings? Having found California to be solely responsible for the accident, we answer these questions in the negative.

14. The California-Noble contract contained an indemnity provision set out in Section 11, as follows:

"Contractor shall be liable for and shall indemnify Operator against any liability on account of the injury to or death of third parties (including employees of Contractor, Operator and third parties) or the loss or destruction of property of third parties resulting from Contractor's operations hereunder to the limit of Contractor's insurance coverage, except Contractor shall be solely liable for all liabilities arising out of the negligence of Contractor. Any liabilities to third parties other than those referred to in the above sentence shall be borne by Contractor or Operator as determined by law."

The Noble-Universal contract contained an indemnity provision reading as follows:

"Contractor shall hold Operator free and harmless from any and all liability,

3. It should be made clear that this finding is restricted to the facts of this particular case. Generally the Jones Act remedy would be against the immediate employer, as in Williams v. Milwhite Sales Company, supra.

costs and charges, arising out of injuries or damage to any and all persons, employees and/or property in any way resulting from acts or omissions of Contractor, or subcontractors, in conducting its operations hereunder."

15. Counsel for California seem to rely upon the series of cases following Ryan Stevedoring Company v. Pan-Atlantic-Steamship Corporation, 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, to bolster its position. In our view, these cases have no application here, for the reason that Noble and Universal were not guilty of a breach of their contractual obligations to perform in a workmanlike manner that was in any way causally related to the accident, or to the creation or bringing into play of the unseaworthy condition resulting in injury. Atlantic and Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 1962, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798, reh. den. 369 U.S. 882, 82 S.Ct. 1137, 8 L.Ed.2d 284. Further, even if we had found that Universal breached its obligation to perform its contract in a workmanlike manner, we would be forced to conclude that the conduct of the owner, California, was such as to preclude recovery of indemnity, since the presence of the slippery substance on the deck, dry and clean a few minutes before the accident, was not foreseeable by the injured Hebert. Weyerhaeuser S.S. Co. v.

Nacirema Operating Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; Waterman Steamship Corp. v. David, et al., 5 Cir. 1965, 353 F.2d 660.

16. Two other judges of this court have held that contractual indemnity will not be allowed as protection against one's own negligence unless the intention to so indemnify be expressed in unequivocal terms. See Grigsby v. Coastal Marine Service of Texas, Inc., W.D.La. 1964; 235 F.Supp. 97 Mills v. Fidelity & Casualty Co. of New York, W.D.La. 1964, 226 F.Supp. 786, and cases cited therein.[4] In neither indemnity clause is the indemnitor required to assume the burden of the indemnitee's own negligence, in the absence of any fault of its own, and, applying the rule of strict construction against the indemnitee, we decline to read this intention into the contract between the parties.[5]

## II. CALIFORNIA vs. AETNA AND TRAVELERS

17. The California-Noble contract also required Noble to procure insurance on all employees required for operations under the agreement in Section 8, including "(a) Workmen's Compensation Insurance, Employer's Liability Insurance, or both, if in Operator's opinion required for its protection", listing specifically coverage under the Jones Act and the general maritime law, with the added

---

4. Serious questions exist as to whether any indemnity provision against a shipowner's negligent conduct toward members of the crew of its vessel are valid at all. Bisso v. Inland Waterways Company, 1955, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911; Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 1963, 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78; California Company v. Jumonville, 5 Cir. 1964, 327 F.2d 988; Northwest Airlines, Inc. v. Alaska Airlines, Inc., 9 Cir. 1965, 351 F.2d 253; and compare, Alcoa Steamship Company, Inc. v. Charles Ferran & Co., Inc., et al., 5 Cir. 1967, 383 F.2d 46.

5. This court is aware of the decision of the Court of Appeals for the Fifth Circuit decided August 9, 1967, in Loffland

Brothers Co. v. Roberts, et al., O. D. Casing Crews, Inc. v. Continental Oil Company, 386 F.2d 540. The indemnity clause construed in that case, set out in footnote 10, is very similar to those presently before the court. The jury found, however, that the indemnitee, Continental, was free of negligence and it was apparent that the accident arose out of the casing operation being conducted by the third party defendant. In the case at bar, we have found that the sole fault rests upon California, and does not arise out of or result from the acts of Noble or Universal. See also, Standard Oil Company of Texas v. Wampler et al., 5 Cir. 1955, 218 F.2d 768.

precautionary specification that all such policies be endorsed so that:

" * * * in the event Contractor's employee files his claim for compensation against Operator instead of Contractor, his own employer, the insurance company will hold Operator free from any loss so sustained. In the event such endorsement is not approved by the Louisiana supervisory authorities, then such policies shall designate Operator as an additional insured."

The Noble-Universal contract required the latter to provide insurance coverage for claims arising under the Jones Act and the general maritime law, upon all of "its operations and the operations of its employees, agents, representatives and subcontractors." All policies were to be specifically endorsed to include operations in the Gulf of Mexico, and to provide coverage for Noble and anyone for whom it conducted drilling operations as additional insureds.

19. Noble procured insurance from Aetna, Universal from Travelers. In each instance the policies are comprehensive liability policies covering all operations of the named insured. Coverage C of the Aetna policy, and coverage A of the Travelers policy obligate the insurers:

"To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury * * * sustained by any person and caused by accident."

Insuring agreement II requires Aetna to further "defend any suit against the Insured * * * even if * * * groundless, false or fraudulent."

20. Aetna denies liability by reason of the language used in the additional interest endorsement (policy, p. 5), in which California is included as an additional insured, which reads as follows:

"Such insurance as is afforded by this policy shall also apply to the California Company, but only with respect to operations performed by Noble Drilling Corporation for which the California Company may be held legally responsible."

As a general rule, contracts of insurance are to be liberally construed in favor of the insured whenever any doubt or ambiguity exists in the language employed as to coverage.[6] They are, however, the law between the parties and where clear and unequivocal should, and must, be given effect.[7]

Applying these fundamental principles of construction to the above-quoted provisions of the additional interest endorsement in the Aetna policy, and considering further that the California-Noble contract, except for securing galley hands, which had been done, limits Noble's operations to the drilling end of this enterprise and that the premiums for the policy are calculated upon the total drilling payroll of the named insured, Noble, there is little room for speculation as to what the parties intended.[8] We conclude that California is not covered by the terms of the Aetna policy under the plain and unambiguous language employed in the contract.

21. California is also named as an additional insured in Travelers' policy No. NSL–9322469. The policy provides insurance as to liability for operations involving watercraft, but contains, under the heading "Exclusions", a provision

6. Aschenbrenner v. United States Fidelity & Guaranty Co., 1934, 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137; Stipcich v. Metropolitan Life Ins. Co., 1928, 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895; Penn v. National Union Indemnity Co., 5 Cir. 1934, 68 F.2d 567; North River Ins. Co. v. Becnel, 5 Cir. 1929, 33 F. 2d 231; 44 C.J.S. Insurance § 297c(1), pp. 1166–1169.

7. Northern Assurance Co. v. Grand View Bldg. Ass'n, 1902, 183 U.S. 308, 22 S.Ct. 133, 46 L.Ed. 213; 44 C.J.S. Insurance § 294, pp. 1155–1156.

8. Compare, Standard Oil Company of Texas v. Wampler et al., supra, note 3, for construction of the phrase "with respect to operations performed by Noble."

that the policy does not apply under Coverage A:

"*   *   * to the ownership, maintenance, operation, use, loading or unloading of (1) watercraft if the accident occurs away from premises owned by, rented to or controlled by the named insured. *   *   *.

Travelers, however, like Aetna, did not let the matter rest here. An additional endorsement, No. 1721A(I), dated July 2, 1962, states:

"Such insurance as is afforded by the policy for bodily injury liability with respect to watercraft if the accident occurs away from the premises owned, rented or controlled by insured applies only to the named insured."

Thus, the watercraft coverage is restricted to Universal only, for it cannot be said that the galley, food storage compartments, and the loading and unloading area of the deck were controlled by Universal. As we read these contracts, the vessel as a unit was under the control of California, and was in navigation at the time. Universal, at the most, furnished galley and steward hands who worked under Anderson's direction, who was the owner's representative. California agreed to furnish the S–55 drilling barge complete with galley and living quarters, the operation of which was arranged for and secured by Noble for its account.

■ This insurance policy relates to the operation of a vessel and is a maritime contract in the purest sense. It must be construed according to maritime principles. Hebert and all of Universal's men aboard the S–55 were members of the ship's complement, not land-based workmen performing duties traditionally performed by seamen. They ate, slept, worked and lived aboard her when off duty. They were attached to her on a permanent basis for an unspecified time. Their work consisted of the performance of activities required for the accomplishment of her purpose and mission. They were subject to the ship's discipline and

to the operator's orders. One would indeed be naive to hold to the proposition that the Universal chief steward or any other member of the galley crew, in "controlling" their allotted area of the vessel, could dictate the manner in which the supplies were loaded and stored, the time they were to come aboard, when meals would be served, beds made, decks cleaned, heads and showers scoured and mopped. The barge captain issued the orders and correlated the departmental activities aboard ship so she could function as a unit. He did this for California.

There are no formal shipping articles required of the men engaged in service as crew members aboard the many special purpose vessels which are now in operation in our coastal waters. They are not subject to discipline by the master in the traditional sense. There is no brig, no fine for disobedience or other like punishment to be visited upon them for infractions of the articles. It is far more simple and perhaps more disastrous. They are simply fired, either by the owners directly or by remote control. They leave the job on the next crew boat. Performance must be, as these contracts provide, to the owner's satisfaction.

■ To clinch the intention of Travelers not to cover California or even Noble in regard to offshore operations, we make further reference to the Contractual Liability Coverage Endorsement. Coverage Y binds the insurer "*   *   * to pay on behalf of the insured all sums which the insured by reason of the liability assumed by him under any written contract *   *   * shall become legally obligated to pay as damages *   *   * caused by accident." The Noble-Universal contract referring to the S–55 operation is listed among those contracts so covered. (See Endorsement 3985E (15), Item 5.) California is an additional insured as stated above. The policy is dated May 1, 1962, which is the date of the Contractual Liability endorsement. Endorsement No. 1721A(J) was added to the policy on the same date as No. 1721A

(I), quoted above. This endorsement reads:

"Such insurance as is afforded under Coverage Y of the contractual liability coverage endorsement *does not* apply to bodily injury * * * *of any employee of the insured* * * *. with respect to which injury the insured has assumed liability * * *. *in connection with offshore operations of the insured.*" (Emphasis supplied.)

At this point it is not difficult to devine that this court at least (or at last), concludes that the foregoing exclusions and limitations of coverage bars recovery by California, for the same reasons stated in paragraph 20.

22. Two additional factors supporting these conclusions must be borne in mind: (1) that California makes no claim for a failure to secure insurance as required by the contract, and (2) all policies of insurance procured by Noble and Universal were presumably submitted to and approved by California under Section 9 of the California-Noble agreement. These limiting endorsements in both policies considered also apply to the Contractual Liability Coverage Endorsement to be found therein. That California was aware of possible exposure to liability as a result of its operation is demonstrated by the fact that it procured insurance also from Firemen's Fund.

### III. NOBLE vs. UNIVERSAL and TRAVELERS

23. Noble cannot claim indemnity from Universal under the contractual indemnity clause, set out in paragraph 14 above, since Universal is in no way at fault. A further endorsement of Travelers' policy, however, removes the obstacle presented by Endorsement 1721A(J) to California's claim insofar as Noble is concerned. Endorsement 1721A(M) broadens Travelers' liability under Item 5 of the schedule of contracts to include expressly an agreement to:

" * * * defend and discharge, and to hold Operator [Noble] free and harmless from any and all claims, liabilities, suits, chose ex delicti or other causes of action and charges arising out of (a) injuries to or death *of any employees of Contractor [Universal]* * * *." (Emphasis supplied.)

By virtue of this endorsement, since Noble was likewise not at fault in this instance, Travelers owes the cost of Noble's defense in this suit brought against it by California, and Noble should have recovery over to this extent. We do not think that this endorsement of the Travelers policy in favor of Noble admits of any further discussion, so clear is its language.

For the foregoing reasons, we hold:

1. The third party demands of California against Noble, Aetna, Universal and Travelers are denied.

2. The cross-claims of Travelers against Aetna and Firemen's Fund are denied.

3. The cross-claim of Noble against Travelers for recovery over under Endorsement 1721A(M) to the extent of its costs and charges in defending the third party demand against it by California is allowed. The amount of such costs and charges will be determined hereafter in accordance with the stipulation of the parties. Noble's cross-claim for recovery over under the indemnity clause of the Noble-Universal contract is denied.

4. A formal decree will be prepared and submitted for signature in keeping with the foregoing, in accordance with Rule 9(e) of this court, and judgment will become effective only upon entry thereof after signing.