Mickey **FRANCIS** and Norma Francis, his wife, Plaintiffs,

v.

**PAN AMERICAN TRINIDAD OIL COMPANY**, a Delaware corporation, and Amoco Trinidad Oil Company, a Delaware corporation, Defendants.

**Civ. A. No. 3819.**

United States District Court, D. Delaware, Wilmington Division.

May 8, 1973.

B. Wilson Redfearn, Tybout, Redfearn & Schnee, Wilmington, Del., and Paul S. Edelman, Kreindler & Kreindler, New York City, of counsel, for plaintiffs.

Ernest S. Wilson, Jr., Wilson & Russell, Wilmington, Del., and T. E. Byrne, Jr., of Krüsen, Evans & Byrne, Philadelphia, Pa., of counsel, for defendants.

## OPINION and ORDER

CALEB M. WRIGHT, Chief Judge.

This is a suit in admiralty in which the plaintiffs, Mickey Francis (Francis) and Norma Francis, seek damages for personal injuries sustained by Francis on December 5, 1967 in the course of his employment as a deep-sea diver. The defendant is Pan American Trinidad Oil Company whose name was later changed to Amoco Trinidad Oil Company (hereafter Amoco). Francis's complaint presents a claim for recovery under the Jones Act, 46 U.S.C. § 688, for the defendant's alleged negligence and a claim for damages based on the defendant's breach of its alleged duty to maintain a seaworthy vessel. Reiterating the factual allegations of Francis's claims, Norma Francis requests damages for the loss of consortium as a result of her husband's injuries.

The case is presently before the Court on the defendant's motion for summary judgment on the grounds that (1) the plaintiff was not employed by it and therefore cannot state a cause of action under the Jones Act, and (2) the defendant was neither owner nor operator of the vessel in issue and therefore is not responsible for any unseaworthy condition of said vessel. In addition, the Court has before it the plaintiffs' motion to amend their complaint to add

the Santa Fe Marine, Inc. (Santa Fe) as a party defendant.

## THE FACTS

Discovery has been substantially completed and the following facts do not appear to be in dispute. At the time of the accident, Francis was an employee of Corrosion Protection Mfg., C.A. (Corrosion) a Trinidad corporation which is a wholly owned subsidiary of Underseas Pipelines Company, C.A., (Underseas), a Venezuelan corporation. In October 1967, Underseas had contracted with Amoco to supply all diving services aboard the Blue Water III, an oil well drilling barge owned by Santa Fe. The diving services were to be supplied in the course of drilling operations conducted about four miles off the Trinidad coast.

Amoco had entered a detailed written contract with Santa Fe under which Santa Fe agreed to supply the Blue Water III to man and maintain the vessel, to conduct the actual drilling operations and to provide the drilling personnel and certain equipment requisite in the drilling operation. Amoco agreed to supply certain materials and pay for numerous aspects of the drilling operation on a pre-established schedule. The contract specifically provided that Santa Fe was to be classified an independent contractor with the authority and responsibility to direct and perform all drilling operations subject to Amoco's inspection and approval.[1] In addition, the contract states that Amoco is only concerned with the finished product of the Santa Fe operations.

The agreement between Amoco and Underseas is delineated in somewhat less detail in a letter of September 28, 1967 from Underseas president, James Coultrop to Amoco. Underseas contracted to provide the necessary equipment, including a submersible diving chamber and deck decompression chamber, and the divers and support personnel. In addition, the letter set forth the rate schedules for furnishing and maintaining the equipment and hourly rates for diving personnel. It does not specifically indicate the status of Underseas and does not state which company would have the authority to direct diving operations. Further, it contains no reference to Underseas' provision of supervisory personnel. The letter contract does, however,

1. The pertinent contract provision provides:

Article 10: Performance of the Work

10.1 *Independent CONTRACTOR Relationship*

CONTRACTOR [Santa Fe], directly and through its employees, shall perform all work in any way connected with the drilling operations herein contemplated. In the performance of this work, CONTRACTOR is an independent contractor with the authority to control and direct the performance of the details of the work, COMPANY [Amoco] being interested only in the results obtained. However, the work contemplated herein shall meet the approval of COMPANY and be subject to the general rights of inspection and supervision herein provided to COMPANY to secure the satisfactory completion thereof. None of CONTRACTOR's employees or employees of its subcontractors shall be considered employees of COMPANY.

10.2 *COMPANY's Representative*

The actual performance and superintendence of all work hereunder shall be by CONTRACTOR. However, COMPANY shall be entitled to designate a representative or representatives who shall at all times have complete access to the Bluewater No. 3 for the purpose of observing or inspecting the work performed by CONTRACTOR in order to judge whether, in COMPANY's opinion, CONTRACTOR has complied with the provisions of this contract. Such representative or representatives shall be empowered to act for COMPANY in all matters relating to CONTRACTOR's performance of the work herein undertaken. CONTRACTOR agrees at all times to cooperate with and render reasonable assistance to employees of COMPANY or employees of COMPANY's contractors performing any function under this contract.

list certain insurance policies which were apparently to be maintained by Underseas, including provision for contractor liability and employee coverage.

Initial drilling under the Santa Fe contract commenced sometime in October 1967. In addition to Santa Fe and Corrosion personnel, Mr. Jess J. Moser (Moser) and a Mr. Black of Amoco were aboard the vessel to further Amoco's interests. The status of these two individuals, particularly Moser who was the senior officer, is in dispute and constitutes the pivotal issue in the determination of the instant motion for summary judgment.

Corrosion's equipment was located on the starboard side of the vessel approximately 120 feet from the drilling equipment which was situated just inboard in the bow area of the vessel. This equipment was located under the direction of the Santa Fe marine superintendent in charge of flotation and maintenance of the vessel. The depositions of the Coultrop brothers of Underseas and Corrosion indicate that Jack Coultrop, diving superintendent for Corrosion, was concerned about the distance between his equipment and the drilling area of the vessel. This concern was voiced to Moser who consulted with the Santa Fe marine superintendent and conveyed Santa Fe's position that the equipment could not be situated closer to the drilling area because of the necessity for distributing weight to facilitate flotation maintenance and drilling stability.

The dives which gave rise to Francis's injuries and the instant litigation occurred on December 5, 1967. The dives were undertaken in an effort to recover a wire cable which was ordinarily attached to the diving bell and directed the bell's descent to the well head on the ocean floor. For reasons which are presently disputed, the cable had severed and lay on the bottom. Diving with scuba gear, Francis was supposed to descend to the well head with a rope from the vessel and secure the rope to the sev-

ered cable. The exact factual depiction of the diving operations and the procedures used are of probable significance to the question of negligence, however, they are not pertinent to the instant motion. In essence, Francis was unable to get the rope to the bottom on his first effort, and it was necessary for him to undertake a second dive to accomplish that objective. There is some uncertainty concerning the nature of the discussions between the Coultrops and Moser preceding the second dive and Moser's role in directing or ordering that the second dive be undertaken. Regardless of the resolution of this dispute, the record shows that Francis commenced his second dive almost immediately after surfacing and without undergoing surface decompression. After surfacing from his second dive, Francis was evidently not aided by his fellow employees in removing his equipment and was somewhat delayed in gaining access to the decompression chamber. The injuries and discomfort upon which Francis bases this action allegedly arose as a result of his performing the second dive without adequate decompression and without proper decompression upon its completion.

## THE DEFENDANT'S SUMMARY JUDGMENT MOTION

Amoco maintains that the undisputed facts demonstrate that it had entered into two contractual relationships with Santa Fe and Underseas respectively for (1) provision and operation of the vessel and for performance of the drilling, and (2) provision of all diving services, including equipment, personnel and supervision. These relationships are alleged to establish Santa Fe and Underseas as independent contractors with the consequent legal status applicable thereto. Under such contracts and legal status, Francis could not establish the necessary employer-employee relationship to prevail on his Jones Act claim nor prove that Amoco had the requisite control

over the vessel or its appurtenances to be liable under the unseaworthiness doctrine.

The plaintiffs argue that the record contains facts and statements which dispute Amoco's claim that Underseas and Santa Fe were independent contractors and demonstrate Amoco's control over drilling and diving operations. Therefore, the plaintiffs respond that summary judgment cannot be entered under the rule's requirement that disputed factual issues must be resolved in favor of the party opposing entry of such a judgment. In essence, the plaintiffs argue that Moser assumed overall supervisory control over drilling and diving activities, and specifically ordered and, in part, directed the dives in which he was injured. Moreover, he contends that alleged defects in the positioning and functioning of the decompression chamber were the responsibility of Amoco in light of Moser's position.

■■ The cases clearly indicate that recovery under the Jones Act is predicated upon establishing an employer-employee relationship. Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949) and Armit v. Loveland, 115 F.2d 308 (3rd Cir. 1940). However, it is also clear that under certain circumstances, an employee of one employer may, for Jones Act purposes, be considered an employee of a second employer. Savard v. Marine Contracting Inc., 471 F.2d 536 (2nd Cir. 1972); Solet v. M/V Capt. H. V. Dufrene, 303 F.Supp. 980 (E.D.La.1969); and Herbert v. California Oil Company, 280 F.Supp. 754 (W.D.La.1967). In such circumstances, the second employer may be liable for negligence under the Jones Act under what has been termed the "borrowed" or "loaned servant" doctrine. Savard v. Marine Contracting Inc., supra, and Solet v. M/V Capt. H. V. Dufrene, supra. See Restatement 2d, Agency § 227.

■ The merit of Francis's Jones Act negligence claim is contingent upon the exact status of Amoco and Underseas and a determination of whether Underseas's employees were servants of Amoco or whether Underseas was an independent contractor. This determination is made under common law standards in light of the facts and circumstances of the particular case. Ward v. Atlantic Coast Line R. Co., 362 U.S. 396, 80 S.Ct. 789, 4 L.Ed.2d 820 (1960). The pertinent considerations are delineated in Restatement 2d, Agency § 220.

§ 220. (1) . . . .

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer; and

(i) whether or not the parties believe they are creating the relationship of master and servant.

See also Harper and James, The Law of Torts, Vol. II, § 26.11. None of the

above factors is conclusive, and therefore the ultimate determination depends on an examination of all factors in the totality of the specific circumstances. In the Court's opinion, the issue of Francis's status as an employee is presently uncertain and cannot be resolved on a motion for summary judgment.

■ There is evidence indicating that Underseas was an independent contractor. Underseas and Corrosion provided all of the required equipment and personnel. The Coultrop brothers evidently controlled and directed the specific details of most of the diving operations. Moreover, Underseas and Corrosion were specialized concerns providing skilled diving services, while Moser professed ignorance of diving operations.

Nonetheless, there are several factors which support the conclusion that Amoco retained or, at least, assumed substantial control over all operations aboard the Blue Water III and that Francis was a "borrowed servant." Moser's testimony reveals that he functioned as considerably more than the inspector provided for in the Amoco-Santa Fe contract. Underseas personnel testified that they had no contact with Santa Fe and that all general orders or directions concerning necessary diving services, as well as any Underseas' problems, were issued by or transmitted to Moser. Although Moser may not have given specific directions regarding the details of the diving, he apparently participated in the conversations among the Coultrops and the Corrosion divers when the diving tasks were discussed and procedures formulated. In addition, the overall drilling operations, as well as the diving activities, were integral and requisite components of Amoco's regular business and overall enterprise, the location, construction and operation of oil wells. See, Herbert v. California Oil Company, supra, 280 F.Supp. at 758, and Sinkler v. Missouri Pacific Railroad Co., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958). The fact that Amoco entered individual contracts with Santa Fe and Underseas but made no provision for cooperative performance between the two companies and their necessarily interrelated services made it requisite for Amoco personnel to oversee and direct certain functions which were essential for the completion of the proposed wells. Resolution of these conflicting factors and Francis's status will involve further factual development and a determination of several factual uncertainties presented in the depositions.

■ The defendant evidently contends that only Moser's negligence would render it liable under the Jones Act. However, if Francis and the other Underseas and Corrosion personnel were "borrowed employees" then Amoco would be liable under the doctrine of respondeat superior for the negligence of its agents, the Coultrops or other Corrosion employees.

■ The claim based on unseaworthiness presents some legal uncertainty regarding what Francis must show to establish a claim against Amoco. Amoco contends that it can only be liable for an unseaworthy condition unless it was the owner or operator of the Blue Water III. However, an analysis of recent cases discussing the unseaworthiness doctrine appears to indicate that liability does not appear to depend simply upon the issue of ownership, but involves rather a question of control. See Haskins v. Point Towing Co., 421 F.2d 532 (3rd Cir. 1970); Solet v. M/V Capt. H. V. Dufrene, supra. Regardless of which legal theory is determinative, the Court is of the opinion that summary judgment is precluded. Although the Santa Fe-Amoco contract states that Santa Fe was an independent contractor, such provision would not be conclusive if the parties' conduct demonstrates that sufficient control has been retained by Amoco. See generally Harper and James, supra, § 26.11 at p. 1396. Moser's testimony regarding his status on the vessel raises serious questions con-

cerning whether Amoco was concerned solely with the final product or whether it exercised control over the vessel's operations. He characterized his role as that of an overall supervisor whose duties included insuring that the Amoco program was performed properly and as planned, as well, as, assisting and supervising this performance when needed. In addition, Amoco's contract with Santa Fe contains provisions which provide it with substantial control over Santa Fe's performance. E. g. 10.7 *Discipline* —permitting it to require that particular crewmen are fired. If Amoco is determined to have ultimate control over the vessel, it is potentially liable for any damages resulting from the unseaworthiness of the vessel.

## THE MOTION TO AMEND THE COMPLAINT

The Court is of the opinion that Santa Fe should be joined and that the claim against Santa Fe should be tried in conjunction with this action. Any delay resulting from permitting the joinder of Santa Fe will be minimal when contrasted to the expenditure of additional judicial energies resulting from a second trial of Mr. Francis's claim.