United States Court of Appeals,

Eleventh Circuit.

No. 95-4639.

Jose Abelardo Calmet COUZADO, Jean Denis Boileau, Claude
Woodhull, Salvador Moran Keydel, Leonardo Moran Auyon, Alcides
Diaz, Plaintiffs-Appellees,

Donna Woodhull, Plaintiff-Appellee-Cross-Appellant,

v.

UNITED STATES of America, By and Through its DRUG ENFORCEMENT
ADMINISTRATION OF THE DEPARTMENT OF JUSTICE, Diverse Agents of the
Drug Enforcement Administration of the United States Department of
Justice, currently unknown, Defendants-Crossclaim Defendants-
Appellants-Cross-Appellees,

Belize Air International, Limited, a Florida Corporation, Trans-
International Crew Leasing, Incorporated, a Florida Corporation,
Don Ewing, Director of Operations, Belize Air International,
Limited, in his individual capacity, Belize Air Operation, Limited
on information and belief, a Belize corporation, Defendants,

Paul Martin, Security Chief, Belize Air International, Limited,
in his individual capacity, Defendant-Cross-Claimant.

Feb. 20, 1997.

Appeal from the United States District Court for the Southern
District of Florida. (No. 92-1135-CIV-FAM), Federico A. Moreno,
Judge.

Before HATCHETT, Chief Judge, DUBINA, Circuit Judge, and COHILL[*],
Senior District Judge.

DUBINA, Circuit Judge:

Jose Abelardo Calmet Couzado ("Couzado"), Jean Denis Boileau

("Boileau"), Claude Woodhull ("Woodhull"), Salvador Moran Keydel

("Keydel"), Leonardo Moran Auyon ("Auyon"), and Alcides Diaz

("Diaz"), (hereinafter "the plaintiffs"), filed suit against the

United States ("the government") pursuant to the Federal Tort

---

[*]Honorable Maurice B. Cohill, Jr., Senior U.S. District
Judge for the Western District of Pennsylvania, sitting by
designation.

Claims Act ("FTCA"), 28 U.S.C. §§ 1346 and 2671-2680. Donna Woodhull ("Donna"), the wife of Captain Claude Woodhull, also brought an action for loss of consortium based upon the injuries her husband sustained due to the government's negligence. Following a non-jury trial, the district court found the government liable and awarded damages to the plaintiffs. The district court did not, however, award damages for loss of consortium to Donna. The government appeals from the district court's judgment and Donna cross-appeals. For the reasons that follow, we affirm in part, reverse in part, and remand.

## I. BACKGROUND

On April 3, 1991, United States Customs ("Customs") agents began investigating a drug trafficking scheme involving several South American countries and the United States. Customs Group Supervisor Peter G. Girard ("Girard") appointed Special Agent Alan Childers ("Childers") to investigate the matter. Childers and Girard met with a Customs special agent in the Miami office and members of the United States Department of State. During this meeting in Miami, the United States Embassy in Belize, by telephone, expressed its desire to ascertain the identity of the drug smugglers. The Belize Embassy then contacted the Belize National Police and arranged for a controlled delivery of cocaine from Belize to Miami using Belize Air Flight 712. The Belize police planned to load 45 kilograms of cocaine onto the plane bound for Miami, where Customs would apprehend the recipients of the drugs.

That same day, Girard attempted to inform the Miami office of

the United States Drug Enforcement Agency ("DEA") of the arrangement. DEA instructed Girard to contact the DEA office in Guatemala to inform them of the plan. However, Girard was unsuccessful in his attempts to contact the DEA in Guatemala. Girard therefore requested country clearance from the DEA so that Childers could go to Belize to determine the status of the controlled shipment. In response to this request, DEA Agent Larry Holifield ("Holifield") in Guatemala contacted Girard. During this initial conversation, Girard disclosed Customs' plan for the controlled delivery to Miami. Soon thereafter, Holifield's supervisor, Robert Stia ("Stia") denied Girard's request for country clearance on behalf of Childers. Instead, one day prior to the controlled delivery, Stia assigned Holifield to Belize to supervise the investigation.

That evening, a Miami Customs agent notified Girard that the DEA had activated its own investigation and that Customs, at that point, was out of the investigation. Girard then contacted Childers and informed him that Customs was no longer involved in the investigation. Although Childers knew that Customs was no longer involved in the controlled delivery, he met with Paul Martin ("Martin"), head of security for Belize Air in Miami. At this meeting, Martin informed Childers of Flight 712's itinerary. Martin also informed Childers that dogs might be used to sniff for drugs on the plane and that these dogs might not be under the control of the Belize National Police. Childers testified that he never discussed his conversation with Martin with anyone at the DEA. Martin testified that Childers never told him that Customs

was out of the investigation and that DEA never contacted him regarding the controlled delivery.

On April 5, Holifield informed Girard that the shipment of cocaine had arrived that morning and that DEA agents would place the cocaine on the Belize flight to Miami the following day. Holifield also told Girard that the DEA had no agents in Miami to handle the shipment once it arrived, so Customs would have to handle the shipment in Miami. Girard informed Holifield that Customs was out of the operation. Nevertheless, Customs reluctantly rejoined the operation, and Girard instructed Childers to coordinate with Holifield. Childers and Holifield spoke one time that evening and discussed only the arrival time of the shipment and the cocaine that would be on board. Holifield had no knowledge that Martin was the head of security for Belize Air or that he needed to contact Martin regarding the operation. In short, vital information regarding the logistics of the operation was not communicated between Customs and the DEA.

On April 6, the Belize National Police, with the cooperation of the DEA, loaded the plane with 45 kilograms of cocaine. The plane then departed to San Pedro Sula, Honduras. After Flight 712 left Belize, Childers and Holifield learned that the plane would stop in Honduras. Nevertheless, neither agency representative notified the Ambassador in Honduras regarding the sting operation. No one from the DEA or Customs inquired about the flight manifest to determine the identity of the crew and possible passengers. In addition, neither agency informed the flight crew that their plane was being used for a covert controlled drug delivery.

Upon the plane's arrival in Honduras, drug-sniffing dogs alerted and that led to a search of the plane and the discovery of the cocaine. Honduran officials arrested and incarcerated the flight crew and the passengers of the flight. Thus began the plaintiffs' nightmare.

Woodhull, Captain of Flight 712, testified regarding his incarceration in the Honduran jail. R. 11-III-146-186. Woodhull stated that the plane carried cargo from Miami to Belize. When the plane arrived in Belize, Woodhull asked if any cargo was being loaded and was told that cargo was being unloaded only. Woodhull did not see any cargo placed on the airplane. When the plane landed in Honduras, Woodhull proceeded to the crew lounge while Couzado, the flight engineer, did the "post flight." *Id.* at 150. About fifteen minutes after Woodhull entered the lounge, Couzado ran in and told him that the authorities had found "coke" on the plane. *Id.* Woodhull ran back to the plane and noticed two cardboard boxes. One of the boxes was open and he saw "packages of something wrapped in plastic." *Id.* at 151. Woodhull called Frank Fine ("Fine"), President of Belize Air, to inform him of the situation. Woodhull then called the station manager for Belize Air. The Honduran authorities interrupted Woodhull's phone calls and insisted that he leave with them.

After Woodhull rejoined his crew and the passengers, the authorities took them all to a hangar, where they remained for four or five hours under armed guard. The hangar had no toilet facilities, no air conditioning, and no water. Honduran authorities then transported the plaintiffs to the Department of

Investigation National ("DIN"), where they were fingerprinted and "run up on the roof."  *Id.* at 158.  Woodhull explained that the roof was an open area located on top of the building that had a tin covered portion and some plywood rooms.  Toilet facilities had existed there at some time, but were no longer operational.  There were no beds or other furniture.  Woodhull noticed rats and numerous roaches in the area.  Woodhull testified that the group spent approximately five days on the roof.

When the plaintiffs arrived at the DIN, the guards did not give them anything to eat or drink.  Woodhull requested that the Honduran authorities contact the United States Embassy, but his requests were denied.  The guards pushed one of the passengers, Auyon, an elderly man, and shoved Woodhull when he tried to intervene.  In Woodhull's presence, one of the guards violently beat an incarcerated Honduran.  One night, while Woodhull was sleeping on a board outside, a guard woke him by kicking him in the back and chest.  The guard handcuffed Woodhull, placed a hood over his head, and marched him downstairs.  The hood was filthy, reeked of vomit, and had no holes for his eyes, nose, or mouth.  Woodhull stated that "they were forcing us down on our knees, and they kept punching us [the plaintiffs], with what I determined later was a rubber hose, putting it on our shoulders, around our neck, the head."  *Id.*  Woodhull further testified that "I heard they were playing spin the cylinder in a pistol, pulling a trigger and things like that. Disconcerting, saying, "Gringo, you are going to die.'
"  *Id.*  While the guards were spinning the barrel of the revolver, they kept a hood on Woodhull.

Woodhull testified that the guards taped his head and violently interrogated him. He stated that at one point they "got a bag of greasy hamburgers that were covered with roaches and stuff like that." *Id.* at 171. Woodhull testified that the plaintiffs did not have clean water to drink or toilet facilities they could use. He stated that the guards used cattle prods around their ears to intimidate them.

Several days after his incarceration, Woodhull met with a representative from the United States Embassy at Tegucigalpa. He told the representative what was happening to the plaintiffs, but the Embassy was unaware that the DEA was involved in a sting operation on Flight 712. On the Wednesday after the plaintiffs' arrest, the guards escorted them to a local Honduran court where Woodhull, through a translator, provided a statement to the judge. After the court appearance, the guards took the plaintiffs to another jail where "the toilets worked." *Id.* at 176. The authorities released the plaintiffs the following Thursday and they returned home on Friday.

Woodhull testified that as a result of the ordeal, he has lost his sense of humor, has no tolerance for incompetence, and is afraid that the incompetence he witnessed pervades all levels of the United States government. He continues to fly outside the country but realizes that the same thing could happen to him again or to someone else.

Keydel also testified about the ordeal. R.12-IV-1-24. Keydel, a Guatemalan citizen, was traveling to the United States with his father to conduct banking business. Prior to being

detained in Honduras, Keydel had no knowledge of the cocaine on the plane.

Keydel testified that the authorities took him and his father to a hangar where armed guards watched them. Later the guards took them to the roof of a police station, where they remained for five days. Keydel described the building as "revolting." *Id.* at 6. Around 2:00 or 3:00 a.m. on the first night of Keydel's incarceration, the guards put a hood on him, handcuffed him, and took him down several flights of stairs where they interrogated and beat him. Keydel testified that the hood, or bag, "smelled of vomit and insecticide." *Id.* at 7. He stated that he was beaten with "a metal piece" and then a wooden stick and that he was threatened with an "electrical noise that sparks." *Id.* Keydel testified that the guards kicked him in the stomach and beat him twice as much because his father was in poor health and they would not beat him. Keydel stated that he slept on the ground with no blanket or sheet. According to Keydel, the guards provided no toilet facilities except for some buckets. In addition, the guards put cardboard on his face and tape around his head on three occasions. Keydel stated that he was not fed while in jail. When the guards transported the plaintiffs to another jail, Keydel was not beaten again, but he was threatened.

Couzado, the flight engineer, testified that after the guards took his fingerprints and photographed him, they interrogated him. R.13-V-151-162. Later that night, two guards put a hood on him, handcuffed him, and threw him down the stairs. A guard with a bat kept "smacking" him. *Id.* at 153. The guards beat him and put a

gun to his head while spinning the barrel.  The guards placed his hands in some liquid that smelled like gasoline and told him that Woodhull had confessed.  They put tape on his face so he almost could not breathe and kicked him constantly.  Couzado testified that when the guards transported the plaintiffs to court, numerous people were laughing at them and he felt humiliated.  Couzado stated that he felt mentally tortured and that the whole experience was "pretty horrifying."  *Id.* at 142.

Boileau, the first officer of Flight 712, corroborated the other plaintiffs' testimony regarding the beatings, the blindfolds, the kicks, and the shoves that they endured during their arrest and incarceration in Honduras.  R.13-V-163-174.

In support of her claim for loss of consortium, Donna testified that her husband left on Saturday morning to fly to Central America and was due to return that same evening, but did not.  R.13-V-89-112.  Donna testified that when she called the airline to inquire why her husband was not home, she was told that his aircraft had a mechanical breakdown and that he would not be returning until Sunday.  When her husband did not return on Sunday, she called the airline again.  This time the airline scheduler told her that Honduran authorities found drugs on her husband's plane and that he and his crew were being detained.  Donna stated that when she received this information, she became very upset and nervous, could not sleep, and kept wondering what would happen. *Id.* at 92.

Donna called the Director of Operations at the airline, and he assured her that the airline was taking care of the problem.  Donna

testified that she went to work that day but when she returned home she became upset because many bills were due and she was working and handling everything. On Tuesday, she called her babysitter to come stay with her small child while she went to the airline to get information about her husband's situation. She spoke with Fine, the President of Belize Air, who said that the operation on the plane was a DEA one that had gone bad. Fine tried to contact political representatives in Washington, D.C., as well as Florida's governor, to obtain some assistance in the matter. Later that day, Donna received a call from the United States Embassy in Honduras informing her that her husband was being held in a Honduran jail and that the Embassy was working for his release. Donna testified that at this point, she was "hysterical." *Id.* at 99. She stated that she was concerned that her husband was not coming home. Donna was lonely and upset; her demeanor also upset her two-year-old child.

On Wednesday, Donna contacted a business associate of Woodhull's. The business associate arranged a telephone call between Donna and her husband. When Donna heard her husband's voice, she said that the first thing that struck her was that he was alive. *Id.* at 102. Thereafter, Donna continued to call the airline, friends, business associates, and Congressmen's offices in Washington, D.C., trying to obtain additional information about her husband's plight. During this time, her son kept asking her where his daddy was, and the more he asked, the more she cried. *Id.* at 103. Donna testified that no one in Washington and no one at the airline would call her back, so she went an entire week with no

information.

In describing what her husband looked like when he returned home, Donna testified that it was "like seeing somebody coming home from war." *Id.* at 109. He looked very tired, his eyes were red, and he had lost weight. In short, "he looked dead." *Id.*

Donna testified that the incident has taken a toll on her entire family. She stated that some of the love and humor that her husband previously possessed are gone. Before the incident, her husband wanted to spend time with her, but now he prefers to be alone. He does not seem to care as much about their son; he is very short-tempered with her; and he has threatened to walk out of their marriage. Donna testified that her husband is a very different person due to this incident. In addition, she worries every time he leaves on a trip that this might happen again.

## II. ISSUES

1. Whether the district court erred in holding that the foreign country exception to the FTCA, 28 U.S.C. § 2680(k), did not apply to this case.

2. Whether the district court erred in failing to award Donna damages on her loss of consortium claim.

## III. STANDARDS OF REVIEW

The district court's legal conclusions regarding the non-applicability of the foreign country exception of the FTCA is subject to *de novo* review. *See Boca Ciega Hotel, Inc. v. Bouchard Transp. Co. Inc.,* 51 F.3d 235, 237 (11th Cir.1995) (statutory interpretation is a question of law subject to *de novo* review). The district court's findings of fact and apportionment of

liability under the FTCA are reviewable by this court only for clear error. *See Soto v. United States,* 11 F.3d 15, 17 (1st Cir.1993); *see also Cole v. United States,* 861 F.2d 1261, 1263 (11th Cir.1988) (factual determinations are governed by the clearly erroneous standard). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

## IV. DISCUSSION

*A. Foreign Country Exception*

In 1946, Congress passed the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-2680. The FTCA was designed to waive sovereign immunity from suit for certain specified tortious acts of federal employees. *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). "It was the offspring of a feeling that the Government should assume the obligation to pay damages for the misfeasance of employees in carrying out its work." 346 U.S. at 24, 73 S.Ct. at 962. Thus, under the FTCA, the government consented, under certain circumstances, to be sued in tort.

The relevant provision of the FTCA provides in part:

(b) ... [T]he district courts, ..., shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ..., for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office of employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the

law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). Thus, individuals generally are capable of recovering from the government and its agencies for injuries sustained as a result of the government's negligence if the state law where the conduct or omission occurred allows such recovery. *Newmann v. United States,* 938 F.2d 1258, 1261 n. 2 (11th Cir.1991).

Congress has recognized, however, that the government's sovereign immunity performs an important function in many instances and has enumerated a number of exceptions to the FTCA. *See* 28 U.S.C. § 2680. The exception at issue in this case is the foreign country exception which exempts "[a]ny claim arising in a foreign country" from the waiver of sovereign immunity. 28 U.S.C. § 2680(k). The government contends that this exception applies here because all of the negligent acts took place in a foreign country. The district court properly concluded otherwise.

First, we look to Florida state law to determine if the government's actions at issue would support a cause of action for the plaintiffs. The Florida Supreme Court has recognized that a defendant owes a duty of care to persons who are foreseeably endangered by the defendant's conduct and fall into the zone of risk which makes the conduct unreasonably dangerous. *McCain v. Florida Power Corp.,* 593 So.2d 500 (Fla.1992). It is clear, under to the facts of this case, that the plaintiffs have a cause of action for negligence against the government. It was reasonably foreseeable that the crew of Flight 712 could be endangered by the failure of the government to notify the Honduran authorities regarding the controlled delivery of cocaine.

Next, we consider where the events at issue occurred. An FTCA claim is decided under the law of the place in which the negligent act or omission occurred and not the place in which the act or omission had its operative effect. *See Richards v. United States,* 369 U.S. 1, 10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492, 498-99 (1962); *Sami v. United States,* 617 F.2d 755, 762 (D.C.Cir.1979); *Leaf v. United States,* 588 F.2d 733, 735-36 (9th Cir.1978); *Donahue v. United States Dep't of Justice,* 751 F.Supp. 45, 47 (S.D.N.Y.1990). These claims are characterized as "headquarters claims."

The plaintiffs urge that a "headquarters claim" exception exists in § 2680(k) jurisprudence under which the location of the injury is not controlling for jurisdictional purposes. This claim is achieved on proof that a negligent failure to warn, instruct or train occurred in the United States.

In *In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 1242, 1255 (E.D.N.Y.1984), *appeal dismissed,* 745 F.2d 161 (2d Cir.1984), the court held that although the injuries to the claimants resulting from the exposure to Agent Orange occurred in Vietnam, the initial decision to use Agent Orange, the decision to continue using it, and the decision relating to the specifications for the herbicide, were all made in the United States. Therefore, the negligent act or omission occurred in the United States and liability was properly imposed upon the government. Thus, "a claim is not barred by section 2680(k) where the tortious conduct occurs in the United States, but the injury is sustained in a foreign country." *Donahue,* 751 F.Supp. at 48.

The plaintiffs in this case have established such a proximate nexus. The district court, in its findings of fact, described the actions of the DEA and Customs as bilateral conduct requiring the coordination of the two agencies and specifically found that these actions constituted a "joint operation." The district court found that the plaintiffs' incarceration was directly and proximately caused by the actions of the government both within and without the United States. Specifically, the district court determined that the government loaded cocaine on the plane in Belize, and the government (mainly DEA Agent Holifield) failed to notify the authorities in Honduras of the controlled delivery. This failure resulted in the plaintiffs' arrest and incarceration. The district court also noted that Customs Agent Childers failed to notify Agent Holifield regarding his investigation of the controlled delivery and this failure also contributed to the plaintiffs' misfortune. In sum, the district court found that the actions of the agencies resulted in a "turf battle" which proximately caused the arrests and incarceration of six innocent individuals.

We hold that the district court's factual findings are not clearly erroneous and, in fact, are amply supported by the record. Many factors occurring within the United States contributed to the utter lack of coordination of the controlled delivery in this case. Childers should have notified Holifield of his investigation and of the possibility that the Honduran authorities might use drug-sniffing dogs to search the plane when it landed. Holifield would then have known that the plane might be subject to a search and that he should notify the Honduran authorities about the

controlled delivery.  Childers should have questioned Holifield about Childers' growing suspicion that the controlled delivery was not being appropriately coordinated.  As DEA Agent Hidgon admitted, the disaster would have been prevented, had the agents communicated to the Honduran authorities about the operation.

We are persuaded that tort liability was properly imposed upon the government in this case.  The plaintiffs proved that the government agents in Florida engaged in acts or omissions that breached a duty under Florida law and proximately caused the plaintiffs' injuries.  In conducting the controlled delivery, the government had a duty to secure the safety of the crew and passengers unknowingly involved in the mission.  The agents' testimony confirms this duty.  Nevertheless, neither Customs nor the DEA ever requested the flight's manifest to determine who would be on board the plane.  At no time did the agents discuss the use of drug-sniffing dogs at any transit stops or the itinerary of the flight.  Customs should have provided the DEA with the information it had to assist the DEA in making informed decisions regarding the delivery.  The Customs agent's failure to divulge critical information and to cooperate with the DEA in executing the controlled delivery negligently compromised the safety of the passengers and the crew and proximately caused the plaintiffs' injuries.  Thus, the district court's judgment in favor of the plaintiffs is supported by the record and is not clearly erroneous.[1]

_____

[1]We note the government's formal acceptance of responsibility in this case.  In a letter written by the United States General Consul in Honduras to the Attorney General of

*B. Applicability of 21 U.S.C. § 904*

The government attempts to justify the applicability of the foreign country exception to the FTCA by turning the court's attention to a claims statute which authorizes the Attorney General to pay tort claims when such claims arise in foreign countries in connection with the operations of the DEA abroad. *See* 21 U.S.C. § 904. Plaintiffs counter that this argument was not raised by the government in the district court and, accordingly, should not be considered for the first time on appeal. *See Allstate Ins. Co. v. Swann,* 27 F.3d 1539 (11th Cir.1994). We agree and decline to consider the issue.[2]

*C. Cross-Appeal*

Donna argues that the district court erred in failing to award her damages for her loss of consortium claim. Under Florida law, the spouse of a person who is injured as a proximate result of the negligence of another has a right of action against that person for loss of consortium. *See Gates v. Foley,* 247 So.2d 40 (Fla.1971). Loss of consortium means the companionship and

---

Honduras on April 12, 1991, the United States declared that the operation was an operation of the DEA in conjunction with the Belize police; that the State and Government of Honduras are exonerated of all responsibility for the detention and legal proceedings against the plaintiffs; and the United States Government accepts responsibility for its error in not having coordinated this operation with the government of Honduras and its authorities.

[2]In the district court, the government also argued that the discretionary function exception to the FTCA applied in this case. See 28 U.S.C. § 2680(a). The government appears to have abandoned that argument on appeal because it fails to discuss the issue in its briefs. Even if the government presented the issue to us, however, we would not be persuaded that the exception applies. Indeed, we conclude that the district court's analysis of this issue is correct and that the exception does not apply.

fellowship of husband and wife and the right of each to the company, cooperation, and aid of the other in every conjugal relation. *Id.* at 43. "Consortium means much more than mere sexual relations and consists, also, of that affection, solace, comfort, companionship, conjugal life, fellowship, society and assistance so necessary to a successful marriage." *Id.* The wife's right of action is a derivative right and she may recover only if her husband has a cause of action against the defendant. *Id.* at 45.

As previously stated, the government was negligent in its handling of the controlled delivery operation. As a proximate result of the government's negligence, Woodhull was injured. The unrebutted testimony shows that Donna was deprived of her husband's companionship, fellowship, and aid for the eleven days he was incarcerated in Honduras. Additionally, the evidence shows that after Woodhull returned to the United States, his marital relationship with his wife changed. Donna testified that Woodhull is more withdrawn, wants to be by himself, is not concerned about her or their child, is very short-tempered, and has threatened to walk out of the marriage. The evidence clearly shows a deterioration in the conjugal relationship.

Where the unrebutted substantive evidence shows a loss of consortium, an award of zero damages cannot stand. *Bach v. Murray,* 658 So.2d 546 (Fla.Dist.Ct.App.1995). *See also Villatoro v. Concepcion,* 671 So.2d 216, 217 (Fla.Dist.Ct.App.1996) ("A zero verdict for loss of consortium cannot stand where liability is conceded and there is evidence to support a verdict of nominal damages.").

For the foregoing reasons, we affirm the judgment of the district court imposing liability upon the government pursuant to the FTCA.  We reverse the judgment of the district court on Donna Woodhull's claim of loss of consortium and remand this case for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.