**John ECKERT, et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

**No. 01–8449–CIV.**

United States District Court, S.D. Florida.

July 29, 2002.

Paul T. Hofmann, Cappiello, Hofmann & Katz, Newark, NJ, Paul T. Hofmann, Richard A. Hines, Cappiello, Hofmann & Katz, New York City, Michael John McHale, Jensen Beach, FL, for Plaintiffs.

Gregg A. Cervi, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, James Daryl Gassenheimer, Rachel Sherry Cohen, Mase & Gassenheimer, Miami, FL, Jan Michael Kuylenstierna, Fowler, White, Burnett, Hurley, Banick & Strickroot, Miami, FL, for Defendants.

### ORDER ON DEFENDANTS' RESPECTIVE MOTIONS FOR SUMMARY JUDGMENT

MIDDLEBROOKS, District Judge.

THIS CAUSE comes before the Court upon the following four motions for summary judgment: (1) the United States of America's Motion for Summary Judgment, filed May 14, 2002 (DE# 69); (2) the ARS Defendants' Motion for Summary Judgment, filed May 17, 2002 (DE# 74); and (3) and (4) the Raytheon defendants' two separate Motions for Summary Judgment,

one filed April 18, 2002 (DE# 57) (directed at the Jones Act claim) and one filed June 26, 2002 (DE# 107) (directed at several other claims). The plaintiffs have filed respective responses in opposition to all of these motions,[1] and the United States, ARS, and Raytheon defendants have filed replies thereto. Therefore, the issues have been fully briefed and are ripe fore adjudication. The Court has reviewed the record, the numerous submissions of counsel, the relevant statutory and caselaw, and is otherwise fully advised in the premises. For the following reasons, the Court finds that three of these motions are due to be granted in full, while the fourth shall be denied.

## I. *Legal Standard*

Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," show that this standard is met. Fed.R.Civ.P. 56(c). Further, it is the moving party who bears the burden of meeting this exacting standard. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In the district court's application of this framework, the evidence, and all reasonable factual inferences drawn therefrom, must be viewed in the light most favorable to the non-moving party. *See Arrington v. Cobb County*, 139 F.3d 865, 871 (11th Cir.1998); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). However, "[t]o defeat a motion for summary judgment, the nonmoving party may not rely on 'mere allegations' ... [but] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party. Summary judgment may be granted if the evidence is 'merely colorable.'" *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir.1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Similarly, the Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value." *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir.1985); *see also Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir.2000).

## II. *Factual Background*

The facts, as culled from the depositions, affidavits, answers to interrogatories, and other permissible submissions, are as follows.[2] In June of 1999, plaintiff John Eckert ("Eckert") was employed by Raytheon Range Systems Engineering Support Company ("Raytheon") as an Acoustic Hardware Engineer at the

---

1. The Court also notes that to the extent that the plaintiffs appear dissatisfied with their original responses to these motions, they simply filed "supplemental" responses. This is in direct contravention of Local Rule 7.1.C, which provides that aside from the motion, a response, and a reply, "[n]o further or additional memoranda of law shall be filed without prior leave of Court." No such leave was sought or given.

2. In their respective responses to both of these motions, the plaintiffs avert to the rela-

tive paucity of discovery they had taken in this action prior to being required to file their responses, and apparently prior to the current date as well. The plaintiffs filed this case on May 18, 2001. The trial in this action is set for the two-week trial calendar beginning August 5, 2002. The original discovery deadline of June 1 was extended to June 21, 2002. While it is of course true that summary judgment should only be considered "after adequate time for discovery," *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548, surely such adequate time has been allowed here.

Navy's Atlantic Underseas Test and Evaluation Center ("AUTEC"). Eckert had held this position since February of 1998. AUTEC is located on Andros Island, Bahamas.[3] Raytheon was the contract operator of the AUTEC facility. Included in Eckert's engineering duties was repairing, testing, and testing certain equipment, maintaining supplies for his one-person department, loading equipment onto and off of various vessels, and at times going to sea to collect water samples and to test acoustic equipment.[4] According to the parties, Eckert was at sea for work somewhere between five and seven or eight days per month. *Compare* Aff. of Dave Hutchinson, att. as Ex. B to Raytheon Defs.' Mot. for Summ. Judg. ¶ 6 ("Eckert spent approximately 5 days a month at sea for the purpose of testing equipment, taking water samples and checking the OHDF as needed.") *with* Depo. of John Eckert, attached as Ex. 4 to U.S.A.'s Mot. for Summ. Judg., at 110:20–21 ("Q: Actually at sea on a vessel? A: It's a quarter of my time.") (hereinafter "Eckert depo."). According to his deposition testimony, Eckert "was a hardware engineer ... [whose] job duties were to maintain, install all the acoustic measurement systems, environmental sampling system that [they] used on the vessels when [they] went to sea for testing." Eckert depo. at 61:09–14. Eckert also worked on some equipment called the Acoustic Doppler Current Profile, and in that capacity he would be at sea for approximately four to five days. *See id.* at 107:08–25.

Eckert stated that he was never a permanent crew member or officer of any vessel and was not hired as a seaman or a crewman. *See id.* at 61:15–22. Eckert further confirmed that he was employed by Raytheon, was not a civil servant of or in active duty in the U.S. Navy, and was not an employee of the U.S. government. *See id.* at 62:20–63:02. In his responses to the United States' interrogatories, as well as those of the ARS defendants, Eckert unqualifiedly stated that his employer was Range Systems Engineering Support Company. *See also* Pls.' Resp. to the Raytheon Defs.' Mot. for Summ. Judg. at 3 ("On June 18, 1999, plaintiff John Eckert was injured while performing work upon the OHDF tower in furtherance of his duties as a Jones Act seaman *to his Jones Act employer, Range Systems Engineering Support Company, one of the Raytheon defendants.*" (emphasis added)); Pls.' Resp. to Def. Autec Range Servs.' Mot. for Summ. Judg. at 2 ("It is undisputed that, at that time, he was employed as a Hardware Engineer *by Range Systems Engineering Support Company ....*" (emphasis added)).

Located approximately one mile from the AUTEC facility is a structure called the Ocean Haul Down Facility ("OHDF"), which is used for testing the hydrodynamic characteristics of various underwater shapes. The OHDF tower is a one-story building, constructed of corrugated metal and permanently affixed atop a platform. The platform is in turn anchored to the sea

---

**3.** The Bahamas is comprised of several islands, which together form an independent country that gained its independence from British rule in 1973.

**4.** When asked at his deposition about his job duties, Eckert responded that he was responsible for "like five major groups of equipment ...." Eckert depo. at 103:15–16. When asked what he did with this equipment, Eckert responded:

> I prepared it to make sure it was working or would it work when we got on board to the boats. And then when we would finally get ready to go to sea, I would be the one to load it on the boats, got it working on the boats, then we would go to sea and do our testing. And when we came back, I was in charge of getting it off the boats and making sure everything was okay and clean. *Id.* at 103:18–24.

floor by four pilings. Fixed to the roof of the OHDF tower is various weather-monitoring equipment. Running vertically up one of the pilings upon which the OHDF is secured is some cable conduit piping. The piping runs from the leg horizontally over to the building, then vertically up a corner of the building to the roof. There is a railing that runs around the outside of the platform, although the roof of the tower does not have any guardrails.

On June 18, 1999, Eckert was tasked with repairing this weather-monitoring equipment. He arranged for a boat ride from Andros Island to the OHDF tower. Mar Range Services ("Mar"), a subcontractor of Raytheon, was responsible for the maintenance and operation of many of the vessels used at Andros Island. *See* Eckert depo. at 73:04–06 ("Q: Who is Mar Marine? A: They're the contractor that operates the vessels."). A Mar employee, Mark Smith, arranged to pick up Eckert and transport him to the OHDF facility. Smith transported Eckert to the OHDF facility in a small outboard-motor boat.

Upon reaching the OHDF tower, Eckert used the cable piping as a handhold and the railing as a foothold to hoist himself up onto the platform. Once on top of the roof, Eckert performed the necessary repairs to the weather equipment. Unfortunately, upon attempting to lower himself from the roof back to the platform, Eckert lost his footing and fell, hitting his back against the railing that runs around the platform before dropping into the ocean below. Eckert testified that he could not at that point feel or move his legs. Smith maneuvered the boat into a position in which he could assist Eckert in staying afloat and stabilizing his body. Eventually, Eckert was transported to a medical facility in West Palm Beach, Florida, for treatment.

Eckert sustained these injuries as a result of the above-described fall and has brought the current action in an attempt to recover damages from the United States of America, the Raytheon defendants, and the ARS defendants arising from these injuries. In the complaint, the plaintiffs assert that "[i]n general, the jurisdiction of the Court" arises pursuant to the Jones Act, "General Admiralty and Maritime Law," the Federal Tort Claims Act ("FTCA"); the Military Claims Act; the Defense Base Act; the Foreign Claims Act; the Nonscope Claims Act; the International Agreements Claims Act; the Military Personnel and Civilian Employees Claims Act; and "[a]ny and all such other applicable federal statutory programs for the benefit of injured persons . . . ."

## III. *United States' Motion*

The United States has moved for summary judgment on numerous grounds, including that Eckert was not a "seaman" within the definition of the Jones Act, that the United States was not Eckert's employer for purposes of the Jones Act, and that Eckert cannot maintain a private cause of action on the vast majority of his putative jurisdictional allegations. Due to the existence of certain factual disputes, which shall be discussed further in connection with the Raytheon defendants' motion, the Court cannot at this point rule as a matter of law on this first contention. However, that is not fatal to the United States' motion, for the Court finds that the United States was not Eckert's Jones Act employer and further, that the plaintiffs' remaining jurisdictional assertions are unavailing.

 The Jones Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law . . . ." 46 U.S.C.App. § 688. "The cases clearly indicate that recover[y] under the Jones Act is predicated upon establishing an employer-employee relationship."

*Francis v. Pan Am. Trinidad Oil Co.,* 59 F.R.D. 631, 635 (D.Del.1973). Further, the Supreme Court has unequivocally stated that there is "no doubt that under the Jones Act only one person, firm, or corporation can be sued as employer," although "[t]he seaman's substantive rights are the same whoever is the employer." *Cosmopolitan Shipping Co. v. McAllister,* 337 U.S. 783, 791, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949); *see also McAleer v. Smith,* 57 F.3d 109, 115 (1st Cir.1995) ("The Jones Act remedy is available only against the seaman's employer."); *Mahramas v. American Export Isbrandtsen Lines, Inc.,* 475 F.2d 165, 170 (2d Cir.1973) ("There has never been any question that the Jones Act applies only between employees and their employers, and the Supreme Court made explicit in [*Cosmopolitan Shipping*] that only one person, be it an individual or a corporation, could be sued as the employer." (internal citations omitted)).[5]

■ In determining whether the plaintiff and defendant in a Jones Act case have the requisite employee-employer relationship, "[o]ne must look at the venture as a whole." *Cosmopolitan Shipping,* 337 U.S. at 794, 69 S.Ct. 1317. The pertinent questions include: "Whose orders controlled the master and the crew? Whose money paid their wages? Who hired the crew?" *Id.* The plaintiffs bear the burden of providing evidence that the United States was Eckert's employer at the time of the injury in order to make out their Jones Act claim. No such competent evidence has been received.

In the case at bar, the plaintiffs cryptically respond to the United States' motion by arguing that at the time of his injury, Eckert was acting "in furtherance of his duties as a 'seaman' to his Jones Act employer," without actually identifying that employer. However, such semantics are unavailing, for as described above, at all other times, which are numerous, Eckert has unequivocally stated that he was employed by the Raytheon defendants. *See Ballance v. Energy Transp. Corp.,* 2001 WL 1246586, at *4 (S.D.N.Y. Oct.18, 2001) (relying in large part on plaintiff's own statements in complaint and affidavit that defendant was not plaintiff's employer in granting summary judgment in favor of defendant on Jones Act claim). Dave Hutchinson, a Raytheon employee, was Eckert's supervisor. Eckert clearly confirmed that he was not an employee of the United States government. Although a Jones Act claimant should be able to proceed at the inchoate stages of litigation by alleging multiple employers, in the expectation that subsequent discovery would uncover the true facts as to the plaintiff's employer, this rationale does not allow a case to go beyond the summary judgment stage in the absence of any proof that the moving defendant was the plaintiff's employer. Because the plaintiffs have come up with no evidence in this regard, the United States' motion is due to be granted as to the Jones Act claims.

The plaintiffs have also alleged numerous other causes of action as against the

**5.** Courts have recognized a "borrowed servant" theory under the Jones Act, pursuant to which the employee may recover from an entity which, although not the employee's *technical* employer, exercises de facto control over the employee. *See, e.g., Baker v. Raymond Int'l, Inc.,* 656 F.2d 173, 177–78 (5th Cir.1981). There is no evidence to support such a claim here: There is no evidence that the United States exercised any control over the manner in which Raytheon instructed its employees to perform their duties. There is no evidence the United States issued Eckert his paychecks. There is no evidence that the United States supervised Eckert's work performance. There is no evidence that the United States had the right to exercise any employment-related decisions (*i.e.,* hiring or firing) vis-à-vis Eckert.

United States. However, in the Court's recent Order of Dismissal, entered on June 11, 2002, in *John Eckert et al. v. United States of America*, 02–CIV–80054–MID-DLEBROOKS, the Court found that none of these allegations confer jurisdiction over the case because for the most part, these alleged bases in fact provide no jurisdiction to sue the United States. The Court noted the clear mandate that "consent of the United States to be sued 'cannot be implied but must be unequivocally expressed.'" *Rhodes v. United States*, 760 F.2d 1180, 1184 (11th Cir.1985) (quoting *United States v. Testan*, 424 U.S. 392 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). The Court granted the plaintiffs leave to amend the complaint, however, to accommodate the possibility that the plaintiffs could make out a sufficient case under a "headquarters claim" theory to the Federal Tort Claims Act. *See, e.g., Couzado v. U.S. By and Through its Drug Enforcement Admin. of the Dep't of Justice*, 105 F.3d 1389, 1395 (11th Cir.1997).

However, no such amended complaint was filed in *this* case. Therefore, the case travels only on those allegations contained in the operative complaint. "The FTCA's waiver of immunity is subject to several exceptions ...." *Miles v. Naval Aviation Museum Found., Inc.*, 289 F.3d 715, 720 (11th Cir.2002). Specifically, the FTCA states that it "shall not apply to ... [a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k); *see also Smith v. United States*, 507 U.S. 197, 204–05, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993) (holding that the foreign-country exception barred fed-

eral jurisdiction over tort claim arising in Antarctica). The injury here occurred in the Bahamas. *See supra* note 3. The limited evidence the plaintiffs have provided [6]—or described—in no way sufficiently establishes that any alleged negligence occurred on the part of the United States within the United States. Thus, no reasonable juror could so decide, and the United States is entitled to judgment as a matter of law on these remaining claims against it.

## IV. *ARS Defendants' Motion*

The plaintiffs have sued Autec Range Services, a joint venture of Computer Sciences Corporation and Johnson Controls World Services, Inc. (collectively referred to as the "ARS defendants"), under a negligence theory. These defendants argue and the plaintiffs admit that the ARS defendants had nothing whatsoever to do with John Eckert, Andros Island, or the OHDF facility for more than two full years before the date of Eckert's injury.

Briefly, the facts concerning the ARS defendants are as follows. AUTEC operations began back in 1967. Since then, the Center's operational and maintenance requirements have been contracted out to various civilian outfits. Effective April 1, 1992, the U.S. Navy contracted with the ARS defendants for the latter to provide these requirements to the AUTEC facility for a fixed period of five years. Thus, the ARS defendants' contract concerning the AUTEC facility ended on March 31, 1997. At the time the ARS defendants entered into this contract, the OHDF facility had already been constructed.[7] According to

---

**6.** This statement is giving the plaintiffs the benefit of the doubt, for although the plaintiffs refer to various exhibits annexed to their response to the United States' motion, no such exhibits are in fact attached and the Court is unable to find them elsewhere in the record.

**7.** Plaintiffs contend that "[w]hile it does appear that the tower itself ... was already in

place at the time that ARS contracted with NUWC to operate and maintain AUTEC," the weather station had not yet been constructed. However, the documentary evidence submitted in connection with the plaintiffs' response shows otherwise. *See* Ex. 1 to Pls.' Resp. to Def. Autec Range Servs.' Mot. for Summ. Judg., dated May 5, 1992, at p. 2 ¶ 1 ("A weather station *has been set up* at the Ocean

the sworn affidavit of William Kersting, who was the Marine Manager for ARS from April of 1992 until January of 1997, "Already in place when ARS began to provide the [maintenance and operational] services was the [OHDF] .... The OHDF Tower had already been built, structured, engineered and designed by the time ARS began to provide maintenance and operational services at AUTEC." (There are no affidavits to the contrary.) The ARS defendants were required to maintain and calibrate all OHDF equipment and to provide the personnel to perform certain routine maintenance duties.[8]

On May 30, 1995, ARS hired Eckert for the position of Data Analyst on Andros Island. According to Eckert's deposition testimony, he went to sea a total of two times while employed by ARS, neither time being to the OHDF tower. *See* Eckert depo. at 164:03–165:10.

Eckert's employment with these defendants ended on March 31, 1997. On April 1, 1997, the ARS defendants had no further contractual obligations with regard to AUTEC or the OHDF tower. In his deposition, Eckert answered the questions of counsel as follows:

Q. It would be correct to say that again, effective March 31st of '97, neither ARS, Johnson or Computer Sciences were on this project at Andros Island?

A. That's correct.

Q. And on the day of the accident, you were neither employed by ARS, Johnson nor Computer Sciences, correct?

A. Correct, I was not.

Q. And you never worked on the weather station when you were employed by ARS?

A. No.

*Id.* at 167:21–168:06.[9] Approximately twenty-six months later, Eckert was injured when he fell from the OHDF tower. The ARS defendants have no business or other legal connection to the Raytheon defendants.

---

Haul Down Facility ....''). The use of the past tense is telling. The remainder of the letters between ARS and the NUWC relate to weather data collection and dispersion, not to the construction of the OHDF facility. Therefore, the Court finds that the plaintiffs' "conclusory allegations without specific supporting facts have no probative value." *Evers*, 770 F.2d at 986. Apparently the plaintiffs have not sued the entity who constructed the OHDF tower.

8. The ARS defendants' contractual responsibilities vis-à-vis the OHDF facility are set forth in a document attached as Exhibit B to their motion for summary judgment. These enumerated duties state, *inter alia*, that the ARS defendants shall: "maintain the OHDF equipment in a standby/caretaker status," "maintain, check-out, calibrate and operate all OHDF equipment in accordance with [certain] standards," "abide by the AMS for all existing OHDF equipment," "develop and maintain an inventory of Government-provided consumables," and "develop and/or main-

tain technical documentation for all OHDF equipment." None of these items alludes to construction of the tower.

9. Further, and notably, in the plaintiffs' own Amended Concise Statement of Uncontested Facts Which Will Require No Proof At Trial, the plaintiffs declare:

On May 30, 1995, the ARS Defendants hired JOHN ECKERT for the position of Data Analyst .... His duties as a Data Analyst were shore-based and did not include any work, jobs or tasks associated with the OHDF Tower. Effective April 1, 1997, the ARS Defendants no longer held the contract with the NAVY to provide operational and maintenance services at AUTEC.... The ARS Defendants did not own the OHDF Tower. At no time did the ARS Defendants supervise or control the work of [the Raytheon defendants], or their employees .... At the time of the incident JOHN ECKERT was not the employee of any of the ARS Defendants.

■ "To succeed on a negligence claim in Florida, Plaintiff must 'show that the defendant owed a duty of care to the plaintiff, that the defendant breached the duty, that the breach caused plaintiff's injury, and that damages are owed.'" *Miles v. Naval Aviation Museum Found., Inc.,* 289 F.3d 715, 722 (11th Cir.2002) (quoting *Ewing v. Sellinger,* 758 So.2d 1196, 1197 (Fla. 4th DCA 2000)). Further, these requirements are applicable to the general common law of torts as well.[10] "It is a question of law for the court to determine whether there is a duty of care owed by one party to another in a negligence action." *Weissman v. Boating Magazine,* 946 F.2d 811, 814 (11th Cir.1991). According to the Restatement (Second) of Torts, a duty may arise from: (1) legislative or administrative enactment, (2) judicial interpretation of these enactments, (3) judicial decision, or (4) from the facts of the case taken as a whole. *See* RESTATEMENT (SECOND) OF TORTS § 285. None of these considerations apply to the circumstances at bar to create an issue of fact or law as to whether or not the ARS defendants owed Eckert a duty with regards to the injury he sustained.

■ Here, the evidence that has been introduced shows that the ARS defendants did not design or construct the OHDF tower upon which Eckert sustained his injury. It follows that these defendants did not create the zone of danger in which Eckert eventually found himself. Nor did their equipment maintenance responsibilities give rise to such a structurally related duty. Further, the Court recognizes that causation is a question of fact. However, in adjudicating a motion for summary judgment, the Court is not precluded from making determinations of fact-rather, the Court is precluded from weighing competing competent evidence that raises a genuine issue of material fact. "A properly supported motion for summary judgment cannot be resisted on mere allegations alone; such a motion 'pierces' the pleadings a tests whether the factual dispute is 'genuine.'" *Morton v. Abbott Labs.,* 538 F.Supp. 593, 595 (M.D.Fla.1982) (citation omitted). A review of the record reveals that there is no genuine factual dispute as to the issues implicated in the ARS defendants' motion.

In their response to the ARS defendants' motion, the plaintiffs sole argument is that "ARS is quite correct that this situation is analogous to products liability," and that such a theory supports their negligence cause of action. However, under the theory of products liability espoused by the plaintiffs, it is the manufacturer who is held liable for product defects. *See id.* ("Plaintiff in a product liability action

10. The applicable law is somewhat in question, as the ARS defendants originally argued that Florida law applied, which was the law the plaintiffs argued in their response. However, in an unapproved "supplemental" response, the plaintiffs for the first time state that "the court is to look to the general common law of torts," but also argues that "[i]f the court is inclined to look to Florida law," that law supports the plaintiffs' claims as well. As explained in a separate order, the plaintiffs did not move for leave to file this supplemental response, it is wholly untimely, and therefore it shall be stricken. The applicability of maritime law is in question, as Eckert was injured on a fixed platform, not a ship in navigable waters. However, to the extent that a conflict of laws is raised, it is not here an issue, for "[g]eneral maritime law incorporates the general law of torts when not inconsistent with the law of admiralty," *Harrison v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 968, 977 (5th Cir.1978), and the Court finds no inconsistency between this principle and Florida law here. Further, "even though admiralty suits are governed by federal substantive and procedural law, courts applying maritime law may adopt state law by express or implied reference or by virtue of the interstitial nature of federal law." *Id.* (internal quotations omitted).

must ordinarily prove that a manufacturer defendant produced the product that allegedly caused the injury.").[11] The plaintiffs have adduced no evidence that the ARS defendants played any role in manufacturing any parts or equipment utilized at the OHDF tower. Therefore, theories of products liability do not support the plaintiffs' negligence claims against these defendants. Likewise, the evidence does not in any way support a theory of premises liability, as the ARS defendants did not possess or control the OHDF tower facility at the time of Eckert's injury, and nor had they done so for more than two years prior to this date. *See, e.g., Pertl v. Exit Information Guide, Inc.*, 708 So.2d 956, 958 (Fla. 1st DCA 1997) (concluding that defendant was entitled to summary judgment on negligence and strict liability claims where defendant relinquished control over premises fourteen months before injury, and "nothing in the record [ ] suggest[ed] that [the defendant] exercised any control over the property on the date of the accident ...").

Under general maritime law, "the seller of a product is only under a duty to warn of those dangers which are reasonably foreseeable and of which the plaintiff cannot reasonably be expected to be aware." *Harrison*, 577 F.2d at 977. However, there is no evidence that the ARS defendants were the supplier of any materials used on the OHDF tower. Therefore,

they cannot be held liable under a theory of seller's liability.

Therefore, in sum, as a matter of law, the ARS defendants did not owe a duty to John Eckert that was in any way connected to Eckert's injury, which occurred more than two years after the ARS defendants had any connection whatsoever with the OHDF tower or AUTEC facility. Therefore, these defendants' motion for summary judgment is due to be granted in full.

## V. *Raytheon Defendants' Motions*

The plaintiffs have asserted various causes of action against the Raytheon defendants, including a Jones Act claim and general maritime claims for negligence, punitive damages, loss of consortium, and loss of society. The critical inquiry is whether or not Eckert was a "seaman" in relation to his employer, the Raytheon defendants.

■ "The Jones Act was welfare legislation that created new rights in seaman for damages arising from maritime torts. As welfare legislation, this statute is entitled to a liberal construction to accomplish its beneficent purpose." *Cosmopolitan Shipping*, 337 U.S. at 790, 69 S.Ct. 1317. All parties agree that "in order to recover damages under the Jones Act, [a plaintiff] must have the status of a seaman." *O'Boyle v. United States*, 993 F.2d 211, 213

---

11. *See also Sears, Roebuck & Co. v. American President Lines, Ltd.*, 345 F.Supp. 395, 402 (N.D.Cal.1971) ("There is no reason for admiralty not to move with the great majority of land cases that hold that a third party may recover *from a manufacturer* on a products liability theory." (emphasis added)); *In re Alamo Chem. Transp. Co.*, 320 F.Supp. 631, 634 (S.D.Tex.1970):

> Although unknown to admiralty until relatively recent times, a products liability action predicated upon the manufacturer's negligence undoubtedly will now lie in admiralty. [citing cases].

> Thus, a *manufacturer* who fails to exercise reasonable care of a product which, unless carefully made, the manufacturer should recognize will involve an unreasonable risk of causing substantial physical injury to those who use the product for its intended purpose and to those whom the manufacturer should expect to be in the area of probable use, now may be sued in admiralty for physical injuries caused such persons during the product's use in a manner and purpose for which it was manufactured.

> (emphasis added).

(11th Cir.1993) (citing *Hurst v. Pilings & Structures, Inc.*, 896 F.2d 504, 505 (11th Cir.1990)). Further, "[a]s the courts have often lamented, the term 'seaman' is not defined in the Jones Act," and thus, "the difficult—perhaps insurmountable—task of giving a cogent meaning to this term has been left to the courts." *In re Endeavor Marine, Inc.*, 234 F.3d 287, 290 (5th Cir. 2000).

In *Chandris, Inc. v. Latsis*, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995), the Supreme Court squarely addressed "the continuing conflict among the Courts of Appeals regarding the appropriate requirements for seaman status under the Jones Act." *Id.* at 353, 115 S.Ct. 2172. The Court came up with a "status-based standard that, although it determines Jones Act coverage without regard to the precise activity in which the worker is engaged at the time of the injury, nevertheless best furthers the Jones Act's remedial goals." *Id.* at 358, 115 S.Ct. 2172.[12]

The Court developed the following two-part test to determine seaman status under the Jones Act: "First, ... 'an employee's duties must 'contribut[e] to the function of the vessel or to the accomplishment of its mission.' '" *Id.* at 368, 115 S.Ct. 2172. The Court labeled this "threshold requirement" as "very broad." *Id.* (alteration in original). "Second, ... a seaman must have a connection to a vessel in navigation (or to an identifiable group of such vessels) that is substantial in terms of both its duration and it nature." *Id.* The substantiality aspect was necessary, in the Court's view, "to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection to a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea." *Id.* As to the temporal aspect of the second prong, the Court found an "appropriate rule of thumb" to be that "[a] worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act," although "departure from [this benchmark] will certainly be justified in appropriate cases." *Id.* at 371, 115 S.Ct. 2172. The Court later clarified somewhat the "substantial connection" test by declaring that "the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea." *Harbor Tug & Barge Co. v. Papai*, 520 U.S. 548, 555, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997).

■ The facts in the case at bar that are pertinent to the "seaman" inquiry are not clear. Eckert's supervisor stated in his affidavit that Eckert's duties for the Raytheon defendants took him to sea five days a month, which is approximately 16–17% of his time, while Eckert testified that he was at sea about 25% of his time. The difference is only two to three days a month. No actual time records have been introduced by either side. This could be a situation in which departure from the 30% benchmark is appropriate.

Additionally, the plaintiffs have submitted evidence describing AUTEC's "mission" as "to provide a deep-water test and evaluation facility for making underwater acoustic measurements, [and] testing and calibrating sonars ...."[13] Further, these

---

**12.** Accordingly, due to this status-based test, "a worker may not oscillate back and forth between Jones Act coverage and other remedies depending upon the activity in which the worker was engaged while injured." *Id.* at 363, 115 S.Ct. 2172.

**13.** Eckert does not argue that the "vessel" with which he has any substantial connection is the OHDF tower. *See generally Hurst v. Pilings & Structures, Inc.*, 896 F.2d 504 (11th Cir.1990); *Leonard v. Exxon Corp.*, 581 F.2d 522 (5th Cir.1978).

documents state that "AUTEC's vessels are utilized to support on-range and off-range test programs, transport material between the various Andros Island sites ..., and to support range facilities maintenance projects." According to the affidavit of Susan Lesser, a Contracts Manager for Range Systems Engineering Company, the vessels were utilized in part "to support AUTEC's test programs ...." In his answers to interrogatories, Eckert declared that "[a]ll of the work [he] did for the Acoustic Testing department had some involvement with the AUTEC range vessels" and that he occasionally "work[ed] on small boats ... taking water samples and ... measurements as part of a water quality monitoring program ...." In his deposition, Eckert stated that he was responsible for (1) maintaining the equipment that would be used on the boats' missions, (2) loading the equipment onto and off of the boats, (3) and assisting in the testing. *See* Eckert depo. at 103:18–24. It is clear that "[i]t is not necessary that a seaman aid in navigation or contribute to the transportation of the vessel, but a seaman must be doing the ship's work." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). What is not so self-evident is what the "ship's [or ships'] work" is in the circumstances at bar.

The Raytheon defendants make strong and rather persuasive arguments against Eckert qualifying as a "seaman" as per the Jones Act. They argue that the true nature of what occurred is that at most the AUTEC vessels provided transportation for Eckert to perform his testing. Therefore, the argument goes, the vessels contributed to the accomplishment of *Eckert's* mission, and *not* the other way around. *Cf. O'Boyle*, 993 F.2d at 213 (concluding that plaintiff was not "seaman" under Jones Act where he was injured on Japanese fishing vessel he was aboard to "collect[ ] data and conduct[ ] scientific studies").

However, the Court is mindful of the admonition that "[t]he inquiry into seaman status is of necessity fact specific ..." *Chandris*, 515 U.S. at 371, 115 S.Ct. 2172 (quoting *McDermott*, 498 U.S. at 356, 111 S.Ct. 807). Although the *Chandris* court declared that where "undisputed facts" make clear that a plaintiff has a "clearly inadequate temporal connection to vessels in navigation," a court is justified in taking the question from the jury by way of summary judgment or directed verdict, the facts here are not "undisputed" and the 17–25% at-sea time period is not "clearly inadequate." *Id.* Further, it is possible that if a large part of the vessels' mission was to support the AUTEC test programs occurring at the Andros Island site, and Eckert was involved with these tests, he was performing the ships' work. This is not clear, but it is possible.

What *is* clear is that "except in cases where the underlying facts are undisputed, and the record reveals no evidence from which reasonable persons might draw conflicting inferences about these facts, the riddle of seaman's status is one for the jury." *Ardoin v. J. Ray McDermott & Co.*, 641 F.2d 277, 280 (5th Cir.1981) (citing cases). The Eleventh Circuit has confirmed that it is "well established" that "even marginal Jones Act claims should be submitted to the jury" and that taking the question away from the jury should happen only in "rare circumstances." *Hurst*, 896 F.2d at 506 (quoting *Bernard v. Binnings Constr. Co., Inc.*, 741 F.2d 824, 827 (5th Cir.1984)); *see also Barrios v. Louisiana Constr. Materials Co.*, 465 F.2d 1157, 1162 (5th Cir.1972) ("[T]he issue is to be left to the jury even when the claim to seaman status appears to be a relatively marginal one."); *Antoniou v. Thiokol Corp. Group Long Term Disability Plan*, 829 F.Supp. 1323, 1325 (M.D.Fla.1993). This may or may not be one of those "rare circumstances," but that determination

cannot be made on the record and arguments now before the Court.

The Raytheon defendants have also moved for summary judgment on the plaintiffs' non-Jones Act claims. "As the [Supreme] Court has noted on several occasions, the Jones Act and the LHWCA [Longshore and Harbor Workers' Compensation Act] are mutually exclusive compensation regimes ...." *Chandris,* 515 U.S. at 355–56, 115 S.Ct. 2172. The LHWCA is intricately related to the Defense Base Act, which "extended the provisions of the LHWCA" and "applies to employees working on 'any lands occupied or used by the United States for military or naval purposes in any Territory or possession outside the continental United States.'" *Davila–Perez v. Lockheed Martin Corp.,* 202 F.3d 464, 467 (1st Cir.2000) (quoting 42 U.S.C. § 1651(a)). "The purpose of the Defense Base Act is to provide uniformity and certainty in availability of compensation for injured employees on military bases outside the United States." *Id.* at 468. The defendants contend that the AUTEC facility is such a military base, the evidence supports this, and the plaintiffs do not dispute the point. The statute makes clear that "[t]he liability of an employer, contractor, [or subcontractor] under this chapter shall be *exclusive and in place of all other liability of such employer ....*" 42 U.S.C. § 1651(c) (emphasis added). Specifically excluded from the ambit of the Act is "a master or member of any crew or vessel." *Id.* § 1654. The Supreme Court long ago stated, "We must take it that the effect of these provisions of the [LHWCA] is to confine the benefits of the Jones Act to the members of a crew of a vessel plying in navigable waters and to substitute for the right of recovery ... only such rights to compensation as are given by the [LHWCA]." *Swanson v. Marra Bros.,* 328 U.S. 1, 7, 66 S.Ct. 869, 90 L.Ed. 1045 (1946).

Therefore, it is apparent that if Eckert is a seaman, his only right to recovery is under the Jones Act. If Eckert is not a seaman, his exclusive remedy for his injury at the AUTEC military facility is under the LHWCA, through the Defense Base Act. *See Southwest Marine, Inc. v. Gizoni,* 502 U.S. 81, 89, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991) ("A maritime worker is limited to LHWCA remedies only if no genuine issue of fact exists as to whether the worker was a seaman under the Jones Act."). In either event, no claims for punitive damages, loss of consortium, or loss of society under general maritime law may lie in these circumstances. The plaintiffs candidly acknowledge this in their response to the Raytheon defendants' motion directed toward these counts:

> Plaintiffs concede that if Mr. Eckert is to have a cause of action against the Raytheon defendants, it must be as a result of the exception to the application of the LHWCA as his exclusive remedy, stated within the Defense Bases Act, which provides that the exclusive remedy provisions within the LHWCA do not apply is he proves that he is a master or seaman of a vessel. Mr. Eckert's seaman status, of course, is the issue before the court ....
>
> ...
>
> Plaintiffs concede that if the court finds that Mr. Eckert is a Jones Act seaman of Raytheon, no claims are cognizable for loss of services, consortium and punitive damages.

Pls.' Resp. to Raytheon Defs.' Mot. for Summ. Judg. at 6–7; *see also* Affirmation of Paul T. Hoffman, filed July 12, 2002, at ¶¶ 4–5 ("Plaintiff John Eckert concedes that if he is found to be a Jones Act seaman, then his rights and remedies ... will be governed by that statute. As such, he will have no claim under either the LHWCA or the Defense Base Act....

Should the court determine that Mr. Eckert is not a Jones Act seaman, then plaintiff concedes that his exclusive remedy against the Raytheon defendants is under the [LHWCA]. In that case, he and the other two plaintiffs ... would have no claims against Raytheon."). Either Eckert is a seaman and the Jones Act is his exclusive avenue, or he is not a seaman and he by his own admission has no such claims against Raytheon.

Therefore, the Raytheon defendants are entitled to summary judgment in their favor as to the plaintiffs' claims for punitive damages, loss of consortium, and loss of society. However, the Court cannot now make such a dispositive determination as to Eckert's "seaman" status. Because "[e]stablishment of seaman status is the threshold for a Jones Act trial," *Reeves v. Mobile Dredging & Pumping Co., Inc.*, 26 F.3d 1247, 1250 (3d Cir.1994), this issue shall be a high priority at the upcoming trial. Again, however, as the issue now stands, the Court cannot determine as a matter of law that the Raytheon defendants are entitled to a judgment in their favor on the Jones Act claim.

VI. *Conclusion*

Accordingly, based on the above discussion, it is hereby

ORDERED AND ADJUDGED as follows:

1. The United States of America's Motion for Summary Judgment (DE# 69) is GRANTED;

2. The ARS Defendants' Motion for Summary Judgment (DE# 74) is GRANTED;

3. The Raytheon defendants' Motion for Summary Judgment directed at the non-Jones Act claims (DE# 107) is GRANTED IN PART as to the punitive damages, loss of consortium, and loss of society claims.

4. The Raytheon defendants' Motion for Summary Judgment directed at the Jones Act claim (DE# 57) is DENIED.